Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/31/2019 09:06 AM CST

Andrew J. Olson, appellee,
v. Kirsti M. Olson,
appellant.
___ N.W.2d ___

Filed December 10, 2019.    No. A-18-1210.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

3. **Child Custody: Appeal and Error.** In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **____: ____.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

5. **Divorce: Child Custody.** When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests.

6. **Child Custody.** When both parents are found to be fit, the inquiry for the court is the best interests of the children.

7. ____. The paramount consideration in determining child custody is the best interests of the children.

8. ____. Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody.

9. ____. The best interests factors of Neb. Rev. Stat. § 43-2923 (Reissue 2016) include the relationship of the minor child to each parent; the desires and wishes of the minor child; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic intimate partner abuse.

10. ____. While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration.

11. ____. In child custody cases where the minor child's preference was given significant consideration, the child was usually over 10 years of age.

12. ____. In addition to the "best interests" factors listed in Neb. Rev. Stat. § 43-2923 (Reissue 2016), a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child.

13. ____. In child custody cases, the preference of a mature, responsible, intelligent minor child regarding his or her custody should be given consideration, but should not be controlling.

14. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

15. **Child Custody: Proof.** Generally, before a court will permit the removal of a minor child from the jurisdiction, the custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent.

16. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in the children's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing

the move, (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent, and (3) the impact such a move will have on contact between the children and the noncustodial parent.

17. **Child Custody.** Removal jurisprudence has been applied most frequently when a custodial parent requests permission to remove a child from the state and custody has already been established.

18. \_\_\_\_. In determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the children and the custodial parent, a court should evaluate the following factors: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent.

Appeal from the District Court for Polk County: RACHEL A. DAUGHERTY, Judge. Affirmed in part, and in part reversed and vacated.

Eddy M. Rodell for appellant.

Steffanie J. Garner Kotik for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Kirsti M. Olson appeals from the order of the district court for Polk County entered on November 26, 2018. The order dissolved her marriage to Andrew J. Olson and awarded the parties joint legal custody of their minor child, Lukas Olson. The court awarded Andrew physical custody of Lukas and granted him permission to remove Lukas from Nebraska to Minnesota.

For the reasons that follow, we affirm in part, and in part reverse and vacate.

## II. BACKGROUND

Kirsti and Andrew married in April 2003 in Minneapolis, Minnesota, and later separated in 2007 or 2008 (we note there was inconsistent testimony as to the precise year). The parties had one child by marriage, Lukas, who was born in 2004. Soon after the parties separated, Kirsti moved back to Nebraska with Lukas, who was then almost 4 years old. Throughout the separation, Lukas resided with Kirsti in Nebraska, with her and Andrew attempting to work out summer and holiday visits for Lukas in Minnesota with Andrew.

Andrew filed a complaint for dissolution of the parties' marriage in the district court for Polk County in August 2017. The complaint requested dissolution of marriage, division of property, and custody of Lukas. At the time of the complaint, Andrew had continued to reside in Minnesota and no prior custody determination had been made. While the complaint did not specifically state such, Andrew also sought to remove Lukas from the State of Nebraska. In September 2017, Kirsti filed an answer and counterclaim seeking both temporary and permanent custody of Lukas, child support, and alimony. The matter was tried before the district court on November 20, 2018.

At trial, because Kirsti was self-represented, the minor child, Lukas, then 14 years old, testified in chambers with only the judge and the court-appointed guardian ad litem present. Lukas testified that he had been attending middle school in Lincoln, Nebraska, since the second half of the previous school year and was previously involved in cross country, track, and soccer until he stopped due to foot injuries. Lukas further testified that he usually earned grades of A's and B's in school. Prior to attending middle school in Lincoln, Lukas attended elementary school in Osceola, Nebraska; was temporarily homeschooled by Kirsti until near the end of his fifth

grade year; and then remained in public school while living in Osceola.

Lukas previously lived with his mother and grandparents but later moved with Kirsti to his uncle's home in Columbus, Nebraska, when he was 13 years old, where he briefly attended seventh grade. He testified that his mother had been unemployed and staying home because she was "sick most of the time" before she saved up enough money for an apartment and found a job. At that point, Kirsti and Lukas moved to Lincoln where they remained up until trial.

Lukas testified that he lived with his younger half brother (who is not Andrew's biological son) and that the two would "fight a lot," but he would often let him into his room "so that he [could] watch videos on YouTube using [Lukas'] hot spot." Lukas noted that while living with his mother, he did not have internet, which made it difficult for him to do his homework. Lukas said that he would often call his father, Andrew, in order to get help with his homework and that Andrew provided him with a cell phone and "hot spot." Lukas had his own room at his mother's home, and he said that he would likewise have his own bedroom at his father's house and that there would "probably be more space there."

Lukas testified that when he stayed at his father's house, it was the two of them and his father's fiance, Carla Perdew (Carlie); occasionally, one of Carlie's children from a previous marriage would also be there. At his father's house, Lukas played games, ate out often, and visited his grandparents and cousins whom he did not see often. Lukas testified that he had several family members in Nebraska, including two uncles, cousins, and his maternal grandparents, whom he "[got] along with . . . great."

Lukas further testified that both his parents had spoken negatively about each other, but he more frequently heard negative comments from his mother. He noted that this made him "feel really bad for [his] dad and just [made him] feel really uncomfortable." He also testified that he frequently

called his father on his cell phone and that sometimes when he got mad at his mother, she would take his cell phone away to prevent him from talking poorly about her to his father. On one occasion, Lukas overheard a discussion about a previous conversation where his mother threatened his father that she would not bring Lukas to visit without receiving money from him for travel expenses for her, Lukas, and Lukas' younger half brother.

When specifically asked if he had an opinion on where he wished to live, Lukas testified that he would like to live with his father during the school year and visit his mother on holidays and during the summer. He noted that he thought his father could "support [him] just a little bit better than Mom can," had a more stable income, and did not yell at him. Lukas then stated that he thought living with his mother was "hazardous" because she was a "hoarder" and the home was dirty with clutter and animal waste. He testified that the cats had urinated on his mattress, on his clothes, and in his closet, and that he often could still smell it. On one occasion, Lukas went to school and when another student mentioned a smell, Lukas smelled his coat and discovered there was cat urine on it. Lukas testified that the environment at his father's house was "[v]ery clean" and that he was not nervous about switching schools because he had "already done it like two times."

Andrew testified that he had resided in Minnesota since he was 17 and that he remained there throughout his entire marriage to Kirsti. Andrew testified that during his marriage to Kirsti, she gave birth to two children, but that only Lukas was his biological son. Around 2008, Kirsti and Andrew separated but remained legally married. Andrew testified that he was employed by the Federal Reserve Bank of Minneapolis where he had worked in technical support for the last 7 years. He worked overnights Thursday through Sunday, and most of his work was done from home with one required office visit approximately every 3 weeks. Andrew testified that despite his work schedule, he would nevertheless be available

to Lukas in the evenings if granted custody. Andrew's pay was between $23 and $24 per hour, and he worked 40 hours per week.

Andrew testified that he provided health insurance for Lukas, that he voluntarily provided financial support to Kirsti for Lukas, that he and his parents had paid for most of Lukas' involvement in extracurricular activities, and that he and his parents exclusively paid for travel expenses for Andrew to see Lukas.

As to his relationship with Lukas, Andrew testified that he spoke with Lukas frequently on the cell phone and that they "certainly communicate every week." When Lukas would visit, the two would "take [the] dog out," visit family, go to movies, and play games. Andrew noted that if Lukas were to come reside with him, there would be opportunities to participate in activities such as taekwondo and soccer, and that he would provide the finances and share information regarding any competitions or events with Kirsti.

Andrew testified that he had several family members living nearby, including his parents, who had a close relationship with Lukas and were "always glad to see him" when he visited. He also noted that Lukas' relationship with Carlie was also good. Andrew went on to testify about his home, that he and Carlie kept the place very clean, and that Lukas would have his own room there.

Andrew testified that he had concerns about Lukas' health with Kirsti because her apartment was "unsanitary" and that he believed her parenting style was "almost dictatorship in style." Andrew believed that Kirsti's use of chores as punishment was not healthy. Andrew testified that up until recently, he was unaware of most medical updates with Lukas, including discussion of the possibility Lukas may have attention deficit disorder. He also had not been given access to resources to check on Lukas' progress in school.

Andrew testified that there had been many instances where Kirsti had attempted to limit Lukas' communication with him

and that she often required Lukas to talk on speakerphone so she could hear what the two talk about. He noted that Lukas was free to contact Kirsti while visiting him.

On cross-examination, Andrew denied ever agreeing that Carlie's child from a previous marriage and Lukas would "never meet again" after an "incident" when Lukas was 6 years old. He further denied ever making a death threat to his previous ex-wife. He testified that he had in fact made Kirsti aware of his attention deficit disorder diagnosis as a child despite Kirsti's insistence that he had only told her about it recently. Andrew further clarified previous statements regarding his relationship with his sister in stating that they were "not extremely close, [but] we're not distant." Andrew denied any current recreational drug use. He further explained that he had removed toxic relationships from his life and had friendships with coworkers. Andrew denied that Carlie ever used drugs or had a drug conviction. He further denied ever counseling Lukas to "bad mouth" Kirsti. Andrew denied ever neglecting family events to play video games. He also denied signing a document giving up parental rights to his child from a previous marriage.

Andrew went on to testify that he wanted to see Lukas have the opportunity to succeed, have access to extracurricular activities, develop a friend base, and "have a chance to grow up with the influence of his father for once in his life" outside of the controlling environment he believed was experienced with Kirsti. He further explained that he would utilize parental discipline through discussion and restrictions rather than punishment through chores. Andrew stated his belief that it was not a parent's responsibility to ensure their child interacts with others, but rather a child would "develop their own friend base."

Andrew's father testified that he spoke with his son a couple times a month and that he and his wife were able to see Lukas once or twice when he came to visit Andrew. He testified that he had no concerns with the cleanliness of Andrew's home. He

went on to testify that Andrew's relationship with Lukas was a "warm, easy-going, comfortable relationship" and that he had no concerns about Andrew's parenting style. Andrew's father noted that he and his wife had previously provided financial support for Lukas by purchasing him a computer, plane tickets, and providing additional funds so Lukas could participate in extracurricular activities. He noted that on one prior occasion, Kirsti had unexpectedly called and said Lukas would not be on a plane to Minneapolis after they were already on the way to the airport to pick him up. He further testified that Lukas and Carlie seemed to "get along comfortably."

Andrew's mother testified that she and Andrew frequently texted each other and that they saw each other in-person a couple of times a month, on average. She testified that she enjoyed "going out," reading, and doing activities with Lukas. She noted that Andrew and Lukas had good interaction while together and that she had no concerns. Andrew's mother testified she and her husband assisted with financial support for Lukas because they "felt that Lukas needed to have extra opportunities and involvement other than just the school."

Andrew's fiance, Carlie, testified that she had resided with Andrew for the past 10 years and that her children had occasionally stayed there when Lukas visited. She testified that she did not have any felony or other criminal convictions. She went on to testify that both her and Andrew ensured Lukas was taking care of his hygiene, but it was mostly Andrew who did so. Carlie described Andrew's relationship with Lukas as being "two peas in a pod" and that her personal relationship with Lukas was "great" despite not doing much together. She testified that she supported Lukas' coming to live with her and Andrew full-time and that Andrew was able to provide a positive environment for Lukas.

On cross-examination, Carlie testified that her daughter had previously stayed with her and Andrew at times when Lukas was visiting and that Lukas may have had to sleep on the couch one night because there were not enough beds. She

testified that she remembered an incident between Lukas and her son, when Lukas was 6 years old, where the two were "horse playing," but that the two have largely been kept apart since then and the event was misunderstood.

In her case in chief, Kirsti offered several exhibits, including Lukas' report cards; notes from recent doctor, dentist, and eye appointments; and recent pay stubs. She also introduced a signed statement detailing her observations and care of Lukas over the years and both her and Lukas' relationship with Andrew.

Kirsti explained the photographs of her apartment that were introduced, noting that the closet of her apartment was left exclusively for the pets because otherwise they would "tear up the whole house." She explained that the clutter and mess in the pictures was only temporary and that the condition of the apartment was not usually like that. She testified that she had a "problem with organization" and that certain areas of the apartment needed to be better organized. Kirsti testified that she hardly drank alcohol but Lukas did not like it when she did. She also noted that her new job was difficult and was the cause of a lot of the mess in her apartment. She explained that Lukas liked things clean, so she regularly had him clean his room because "he's happier when it's clean."

Kirsti testified that she was happy Lukas wanted to spend quality time with Andrew but that she believed she had done a good job parenting him and allowed Lukas to regularly contact Andrew. She testified that throughout their relationship, Andrew had ongoing issues with his previous wife regarding visitation and child support of another child, and that this required Kirsti to support them while she was pregnant with Lukas. She testified that Andrew once made a comment to her about his ex-wife stating, "If you leave me, I'm going to kill [my ex-wife]," and that this made her afraid when they separated.

Kirsti testified that 5 or 6 months after their separation, Andrew began making voluntary child support payments. She

noted that since she moved to Nebraska, it had been more difficult to schedule visits between Andrew and Lukas, but the two largely worked it out. She testified that toward the end of their relationship, Andrew treated her poorly, causing her to become depressed, and that he frequently "spent all his time playing video games."

She testified that when Lukas was in fourth grade and fifth grade, he was struggling to get homework done so she decided to homeschool him temporarily, and that he had since done well in school. She noted that her parents had been supportive and that she and Lukas often visited nearby family. She testified that the decision to move to Lincoln was made because she wanted Lukas to have more of an opportunity to make friends and she needed more opportunities for work. She noted that Andrew's parents had helped out financially with travel costs for Lukas to visit Andrew in Minnesota, but that they rarely initiated contact when Lukas was with her in Nebraska. She also testified that when Lukas was younger, Andrew was far less proactive in reaching out to talk to Lukas, and that he had become more interested as Lukas had gotten older.

Kirsti addressed her concerns with Lukas' living with Andrew's fiance, Carlie, namely because she did not know her very well. She explained that she believed Carlie prioritized her own children over Lukas. For example, when Carlie's daughter visited at the same time as Lukas, he was forced to sleep on the couch. When Carlie's oldest daughter got married, Kirsti did not receive any child support around that time, which she believed to be because of the wedding costs. She testified about an incident between Carlie's son and Lukas when they were younger and that law enforcement was involved but no charges were ever filed.

On cross-examination, Kirsti was asked about the photographs of her apartment and she explained that she believed Lukas intentionally took the photographs to make her "look bad." She added that the photographs did not accurately

reflect the day-to-day condition of the apartment. She went on to testify that she very rarely limited Lukas' cell phone access and that she usually did so only when he was spending too much time on the cell phone "watching YouTube videos." On the rare occasion Kirsti had limited Lukas' cell phone calls with Andrew, she noted that it was because they had been "talk[ing] for so long" and she had somewhere she needed to be with Lukas. She testified that she was trying to get Lukas involved in more extracurricular activities but that he was often "burnt out," so balancing activities and school was difficult. Kirsti testified that she moved to Nebraska to be close to her family and that Andrew gave his permission for her to move.

The court questioned Kirsti about her pets and their history of urinating on Lukas' bed and clothing. Kirsti noted that she cleaned the mattress extensively and "the smell is gone" and that the animals had "gotten better." She noted that she was "undecided" on whether "to get rid of the cats."

Although the district court found that Lukas had done well with Kirsti, it nevertheless found that his overall quality of life would be improved living with Andrew. The court awarded Andrew physical custody of Lukas, subject to reasonable parenting time with Kirsti. The court further amended the proposed parenting plan regarding Kirsti's summer parenting time. This appeal followed.

## III. ASSIGNMENTS OF ERROR

Kirsti asserts the district court erred by (1) awarding Andrew sole physical custody of their child; (2) allowing Andrew to remove the child from the State of Nebraska "without performing a removal analysis"; and (3) allowing her only extended summer parenting time with the child in odd-numbered years, rather than every year.

## IV. STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's

determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

[2] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

[3] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

## V. ANALYSIS

### 1. DETERMINATION OF CUSTODY

Kirsti's first assignment of error is that the district court erred by awarding Andrew sole physical custody of Lukas. Kirsti's primary assertion is that the court improperly rested a majority of its decision on the desires and wishes of Lukas, who testified that he would prefer to live with Andrew.

[4-6] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear, supra*. When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). When both parents are found to be fit, the inquiry for the court is the best interests of the

children. *Id*. Here, both parties concede, and the district court agreed, that both parents were fit for the custody and care of Lukas.

[7-11] The paramount consideration in determining child custody is the best interests of the children. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody. *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016). Such factors include the relationship of the minor child to each parent; the desires and wishes of the minor child; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic intimate partner abuse. See *id*. (citing § 43-2923(6)(b)). With regard to the desires of the child, the statute provides that courts should consider such "regardless of chronological age, when such desires and wishes are based on sound reasoning." § 43-2923(6)(b). The Nebraska Supreme Court in applying this provision has stated that while the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Floerchinger v. Floerchinger, supra* (citing *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002), and *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005)). The Supreme Court has also found that in cases where the minor child's preference was given significant consideration, the child was usually over 10 years of age. *Floerchinger v. Floerchinger, supra* (citing *Vogel v. Vogel, supra*).

[12] In addition to the factors of § 43-2923, the Supreme Court has held that a court may also consider

matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship

between child and parents; the age, sex, and health of
the child and parents; the effect on the child as the result
of continuing or disrupting an existing relationship; the
attitude and stability of each parent's character; and the
parental capacity to provide physical care and satisfy
the educational needs of the child.

*Schrag v. Spear*, 290 Neb. 98, 112, 858 N.W.2d 865, 877
(2015) (citing *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544
N.W.2d 93 (1996)).

[13] Kirsti argues that in awarding physical custody of
Lukas to Andrew, the district court abused its discretion by
placing too much of an emphasis on Lukas' preferences, and
not enough on the current living conditions with her and the
fact she had been Lukas' primary caregiver for over 10 years.
We disagree. While it is true we have held that "the prefer-
ence of a mature, responsible, intelligent minor child regard-
ing his or her custody should be given consideration, but
[not] that it should be controlling," and that other factors are
to be considered under the direction of § 42-2923, see *Adams
v. Adams*, 13 Neb. App. at 286, 691 N.W.2d at 549, nothing
in the record of the present case indicates the district court
abused its discretion by failing to consider the other factors
required by statute.

[14] The district court specifically laid out the best interests
factors of § 43-2923(6) and relevant case law. Although the
district court did not address each factor individually in the
decree, the record indicates it adequately weighed the evi-
dence before it and gave consideration to factors such as the
unclean living conditions at Kirsti's apartment (particularly
the presence of urine and feces from the animals), the com-
parative living arrangements at both Kirsti's and Andrew's
homes, the relationship Lukas has with his father versus the
sometimes tense relationship with his mother, and Kirsti's
occasionally controlling parenting style. The court found no
credible evidence of abuse by either parent. The district court's
order also considered testimony by Kirsti regarding Andrew's

obsession with video games while the two were together, Andrew's previous drinking habits and marijuana use, and an instance where Andrew made a comment about his previous ex-wife that Kirsti found to be threatening. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016). The district court also acknowledged, and considered, the fact that Kirsti had adequately provided for Lukas and his educational and emotional needs since she and Andrew separated nearly 10 years earlier. The district court was entitled to weigh all the evidence before it in conducting a best interests analysis.

Furthermore, the district court did not abuse its discretion by placing significant weight on Lukas' desires. When asked whether he had a preference on whether to live with his father or continue living with his mother, Lukas stated that he would prefer to live with his father. When asked the reasons for his preference, Lukas indicated that he still wanted to see his mother and his younger half brother during breaks but thought his father could support him better because "[h]e has more stable income [and] doesn't ever yell at [him]." He indicated that his father was able to help him with homework and that he did not want "to live in such a hazardous environment anymore." When asked why the environment with his mother was "hazardous," he noted that she was a "hoarder," the apartment was not clean, his mother would lose things, and it caused him "stress[]." Further, Lukas had previously testified that he had a good relationship with his father and Carlie and that he was not concerned about switching schools because he had previously done so and the adjustment was "pretty easy."

This is not a case where the minor child was unable to articulate an intelligent rationale for preferring to reside with one parent over the other. In *Wild v. Wild*, 15 Neb. App. 717, 746, 737 N.W.2d 882, 904 (2007), this court held the minor

child's preferences were not entitled to significant weight because she was unable to provide a "'reasonable and persuasive reason[] for her decision.'" When asked why she preferred to live with her mother, the child responded, "'Uhm, because I think it's, uhm — I think it's a good choice because, uhm, I think I'll be safer there than here.'" *Id.* at 745, 737 N.W.2d at 904. When asked to explain why she felt that way, the child testified, "'It's just a feeling that I get sometimes.'" *Id*. Here, as detailed above, Lukas clearly articulated a reasonable basis for his preference.

The district court was entitled to give significant consideration to Lukas' preferences, and it did not abuse its discretion in doing so. At the time of trial, Lukas was 14 years old, and the district court specifically found him to be "super bright," "really smart," and "very articulate." In its order, the district court noted that "Lukas was very mature in his reasoning and his desires were well thought out." Because the district court was entitled to give Lukas' preferences consideration, and adequately considered the other factors of § 43-2923, we hold that the district court did not abuse its discretion in awarding Andrew physical custody of Lukas.

## 2. REMOVAL OF MINOR CHILD

Kirsti next argues that the district court erred in permitting Andrew to remove Lukas from the State of Nebraska. Kirsti asserts that the district court was required, and failed, to perform a removal analysis as set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), in determining whether removal of the minor child was appropriate. The district court in this case noted in its decree:

> To a certain extent, I do think I'll do some type of *Farnsworth* analysis. Even though the child lived in Minnesota when the parents were together, the child moved here. It's still a removal from the state and I think I have to take that analysis into consideration, and I think the evidence . . . addresses those items.

For the reasons that follow, we find that the district court, to the extent it was required to, did conduct an appropriate *Farnsworth* analysis under the circumstances and that it was not in error to award Andrew custody and permit Lukas to move with Andrew to his home in Minnesota.

[15,16] In *Farnsworth v. Farnsworth, supra*, the Supreme Court established a detailed two-step process required before a custodial parent is permitted to remove a child from the State of Nebraska. The custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent. *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016) (citing *Farnsworth v. Farnsworth, supra*). In determining whether removal to another jurisdiction is in the children's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent, and (3) the impact such a move will have on contact between the children and the noncustodial parent. *Hiller v. Hiller, supra* (citing *Bird v. Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2014)). Under the second "quality of life" prong, the Supreme Court enumerated nine factors to be taken into consideration. See *Farnsworth v. Farnsworth, supra*. Three years after *Farnsworth*, the Supreme Court reaffirmed its removal analysis in *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002), in a proceeding to modify the parties' prior decree of dissolution. In *Vogel*, the mother sought permission to remove her minor children from the State of Nebraska to the State of Virginia, where her new husband had recently been transferred by the U.S. Air Force.

[17] Removal jurisprudence has been applied most frequently when a custodial parent requests permission to remove a child from the state and custody has already been established. *Hiller v. Hiller, supra*. Notably, this court has applied the *Farnsworth* removal analysis in situations where a prior

custody determination has not been established. See, e.g., *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018) (dissolution proceeding where temporary custody order had been established with mother and father was stationed out-of-state); *Hiller v. Hiller, supra* (dissolution proceeding where both parties resided in Nebraska at time of proceeding); *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014) (dissolution proceeding where mother left Nebraska with child prior to filing of dissolution complaint).

In *Rommers*, the parties were before the court on a dissolution action whereby both parties sought custody of the minor child. Prior to the initiation of the dissolution and custody action in Nebraska, the mother had moved with the child to the State of Arizona without the father's knowledge. In reversing the district court's determination that *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), was inapplicable, we held:

> If the Nebraska court system were to allow litigants to mesh original custody determinations and removal determinations in such a way as has occurred in this case, it would allow parents to leave the state with children before any filing occurred and without any repercussions and would allow parents to avoid any scrutiny under a removal analysis. The trial court should have first entered an order regarding custody and then conducted a proper *Farnsworth* removal analysis, which would take into account an appropriate parenting plan in accordance with the custody determination and decision regarding removal . . . .

*Rommers v. Rommers*, 22 Neb. App. at 617, 858 N.W.2d at 616.

Under *Farnsworth*, we first consider whether the custodial parent has a legitimate reason for leaving the state. Here, there is no dispute that Andrew has a legitimate reason for "leaving" the state, and this issue was conceded by Kirsti's counsel during oral argument. Prior to this action, Andrew

had been living in Minnesota since he was 17 years old, and both Kirsti and Lukas lived there with him prior to moving to Nebraska.

Under *Farnsworth*, the court next considers the child's best interests. In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Kashyap v. Kashyap, supra*. See, also, *Farnsworth v. Farnsworth, supra*.

### (a) Each Parent's Motives

The first consideration is each parent's motives for seeking or opposing the move. Both parties concede that there are legitimate reasons for seeking and opposing the move of Lukas to Minnesota. Andrew has lived in Minnesota throughout most of his life. Kirsti has been living in Nebraska for the last 10 years. Both parties are employed in their respective home states. Therefore, we find that both parties have legitimate reasons to seek or oppose the move.

### (b) Quality of Life

[18] Under the second consideration, the Supreme Court has enumerated nine factors to determine whether the proposed move will enhance the quality of life of the child and the custodial parent. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Those factors to be considered are as follows: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of

the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent. *Id*. This list should not be construed as setting out a hierarchy of factors. *Id*. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*. We will address each of these nine factors in turn.

### (i) Emotional, Physical, and
### Developmental Needs

Our first consideration in assessing the extent the move would enhance the minor child's quality of life is the impact it would have on the child's emotional, physical, and developmental needs. The evidence presented shows that Lukas has had a history of attention issues (namely attention deficit disorder) but has improved significantly over time in Kirsti's care and now performs well in school. Nothing in the record suggests that Lukas would not continue to thrive in this regard under Andrew's care; in fact, Lukas testified that Andrew often was available by cell phone to help Lukas with his homework. While Kirsti has adequately provided for Lukas physically in terms of food, medical care, shelter, and the like, there was evidence that her apartment was disorganized and unclean and that the cats had urinated on Lukas' mattress, on his clothes, and in his closet on multiple occasions. Lukas testified that the environment at his mother's apartment was "hazardous." Andrew testified that Lukas had commented to him that fumes from the animals had often made him feel sick.

Emotionally, Lukas has a close relationship with both parents. However, there is testimony that Kirsti's parenting style

is sometimes controlling and that she will impose chores as punishment, will take away Lukas' cell phone if she believes he is talking negatively about her to Andrew, and will often talk negatively about Andrew herself. Overall, this factor weighs slightly in favor of removal.

### (ii) Child's Opinion or Preference

As discussed previously in the custody discussion of this opinion, Lukas expressed a preference to live with his father and provided several well-thought-out reasons for his preference. This factor weighs in favor of removal.

### (iii) Enhancement of Relocating Parent's Income or Employment

Both Kirsti and Andrew are already employed in their respective states and are not seeking removal to pursue alternative employment opportunities. Both parties concede, and we agree, that because this is an initial custody determination, this is a nonfactor and is neutral.

### (iv) Degree to Which Housing or Living Conditions Would Be Improved

The evidence shows that Lukas enjoys having his own room at both Andrew's home in Minnesota and Kirsti's apartment in Nebraska. The district court found, and the evidence shows, that Kirsti's apartment is generally unclean and disorganized. The presence of three animals, which have a history of urinating in Lukas' room and on his clothing and mattress, adds to the uncleanliness. Andrew currently makes between $23 and $24 per hour and works full time. Kirsti currently earns $12 per hour and works full time; however, she has had periods of unemployment while Lukas was in her care. Lukas testified that he believed Andrew could support him "just a little bit better" than Kirsti could. Based on the evidence comparing the conditions of their respective homes and employment, and the testimony that Lukas preferred a clean environment and

referred to Kirsti's home as "hazardous," this factor weighs in favor of removal.

### (v) Existence of Educational Advantages

At the time of trial, Lukas was attending eighth grade at a Lincoln middle school and was performing well, receiving grades of A's and B's in his classes. While there was no evidence presented suggesting the quality of education available in Minnesota, there was also no evidence suggesting that it would be inferior to what Lukas has received in Nebraska. Lukas overcame much of his attention issues after a brief period of homeschooling by Kirsti, and he receives significant help with his homework over the cell phone from Andrew. This factor is neutral.

### (vi) Quality of Relationship Between
### Child and Each Parent

The lower court found, and the evidence suggests, that Lukas has maintained a close relationship with both of his parents. While Lukas has been in Kirsti's custody since he was around 4 years old, he has also established a close relationship with Andrew through regular communication and visits. While Lukas has the occasional disagreement with Kirsti, his relationship with both parents is overall healthy and loving. This factor is neutral.

### (vii) Strength of Child's Ties to Present
### Community and Extended Family

Lukas has lived with Kirsti for around 10 years and has developed a close relationship with his maternal grandparents, whom he lived with for approximately 5 years while in Nebraska. While living with Kirsti, Lukas has also lived with his younger half brother, and although the two occasionally fight, they appear to have a normal sibling relationship. Lukas has also maintained a relationship with his maternal uncles and cousins. On Andrew's side of the family, Lukas has been able to establish a close relationship with his extended family.

When Lukas visits Andrew in Minnesota, he often does activities with his grandparents and has gotten to know his older half brother. Lukas testified that he would like to see his paternal grandparents and cousins more frequently.

While Lukas has lived in Nebraska for most of his life, he has made several moves and attended a number of schools in that time. Lukas testified that switching to a new school does not make him nervous because he had already done so more than once.

The record reflects that Lukas is fortunate enough to have a close and loving relationship with both his maternal and paternal extended family. While a move to Minnesota would decrease Lukas' connections to his maternal relatives, it would allow the opportunity to improve relationships with his paternal relatives. This factor is neutral.

### (viii) Likelihood That Allowing or Denying Move Would Antagonize Hostilities Between Parties

The district court correctly noted that both parties have a close relationship with Lukas, and Kirsti and Andrew have been able to work together to coordinate opportunities for Lukas to visit Andrew in Minnesota. There is no evidence that allowing or denying the move would antagonize the parties. This factor is neutral.

### (ix) Well-Being of Custodial Parent

The final "'quality of life'" factor listed in *Farnsworth v. Farnsworth*, 257 Neb. 242, 250, 597 N.W.2d 592, 598 (1999), is consideration of the "living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent," *id.* at 251, 597 N.W.2d at 599. Accord *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016). This factor focuses largely on "how the proposed new living conditions and employment impact the well-being of the custodial

parent." *Id.* at 789, 876 N.W.2d at 699. Because this is a case where the parties have been living and working in their respective states for several years, and neither party is seeking to relocate with the child, this is a nonfactor and is neutral.

### (x) Conclusion Regarding
### Quality of Life

After our review of the record, we find that the district court was correct in finding that both parties are fit and capable parents. We also note that the court-appointed guardian ad litem for Lukas likewise found both Kirsti and Andrew to be fit and capable parents and expressed his belief that it would be in Lukas' best interests to award custody in accordance with his preference. Furthermore, after reviewing the evidence in light of the *Farnsworth* factors, we find that, although Lukas has done well under Kirsti's care, removal would enhance his quality of life.

### (c) Impact on Noncustodial
### Parent's Visitation

When, as here, the parties live hundreds of miles apart, there will undoubtedly be an effect on the noncustodial parent's visitation. However, Kirsti and Andrew have worked amicably to make the arrangement work and to facilitate visitation for the last 10 years. Regardless of whether or not removal is granted, Lukas will necessarily spend time traveling between the two homes. Permitting removal, therefore, would not increase the amount of time Lukas is required to travel or increasingly burden the parties to arrange visitation as they have previously done.

### (d) Conclusion on Best Interests

A de novo review of the record shows that both parties have a legitimate reason for seeking or opposing the move and that permitting removal would enhance the quality of life of Lukas. While the move will surely affect the amount of time Kirsti spends with Lukas, the parties have been able to work out a

visitation schedule in the past, and the district court imposed an appropriate parenting plan to facilitate organized visits. The record demonstrates sufficient evidence that it is in Lukas' best interests to move from Nebraska to Minnesota and that it was not in error for the district court to determine such.

### 3. Modification of Summer Parenting Time

Kirsti's final assignment of error is that the district court erred in modifying the portion of time allotted to her for summer parenting time within the proposed parenting plan without any explanation for the modification. Both parties, and this court, agree.

At trial, Andrew offered to the court as an exhibit a proposed parenting plan. In the event that Andrew was granted custody of Lukas, the plan called for Kirsti to have extended parenting time every summer with the parties alternating which half of the summer they would receive. In even-numbered years, Kirsti would have parenting time from mid-July until just prior to the start of the school year. In odd-numbered years, Kirsti would have from June 15 until July 30. In its decree, the district court noted it had modified the proposed parenting plan "by changing the portion of the summer parenting time." This change, which can be seen in the modified parenting plan attached the decree, shows the court crossed off the portion of the plan reading: "In the even-numbered years, the mother's summer parenting time shall begin at noon on the ____ day of July and conclude at noon on the Friday immediately prior to the first day of school." Section 43-2923(4) provides that "[i]f the court rejects a parenting plan, the court shall provide written findings as to why the parenting plan is not in the best interests of the child." The district court gave no explanation for the modification, or why it would be in the best interests of Lukas, and we cannot see one evident from the record. Because the parties do not dispute, and we see no reason that Kirsti should not be granted extended parenting time every

summer, we reverse and vacate the modification to the summer parenting time provision of the proposed parenting plan and reinstate such without modification.

## VI. CONCLUSION

We conclude that the district court did not err in awarding custody of Lukas to Andrew and allowing Andrew to remove Lukas to the State of Minnesota. We reverse and vacate the modification to the summer parenting time provision of the proposed parenting plan and reinstate such without modification.

AFFIRMED IN PART, AND IN PART
REVERSED AND VACATED.