Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/13/2021 08:08 AM CDT

- 950 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

ROSS TAYLOR-COUCHMAN, APPELLEE, V.
JESSICA DeWITT-COUCHMAN, APPELLANT.

___ N.W.2d ___

Filed June 15, 2021.    No. A-20-061.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or its action is clearly against justice or conscience, reason, and evidence.

3. **Child Custody: Appeal and Error.** In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Child Custody.** To prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the child's best interests to continue to live with that parent.

5. ____. The factors to be considered in determining whether removal is in the child's best interests include each parent's reasons for seeking or opposing the move, the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and the impact the move will have on contact between the child and the noncustodial parent.

6. ____. In cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from

- 951 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate.

7. **Child Custody: Visitation.** Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time.

8. **Child Custody.** In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the children and the custodial parent, a court should evaluate the following factors: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent. This list does not set out a hierarchy of factors, and depending on the circumstances of a particular case, any one factor or combination of factors could be variously weighted.

Appeal from the District Court for Sarpy County: NATHAN B. COX, Judge. Affirmed.

Jeffrey A. Wagner and Kyle J. Flentje, of Wagner, Meehan & Watson, L.L.P., for appellant.

Kelly T. Shattuck, of Vacanti Shattuck, for appellee.

BISHOP, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jessica DeWitt-Couchman (Jessica) appeals the custody and child support provisions of the decree dissolving her marriage to Ross Taylor-Couchman (Ross). She contends that the district court erred in various findings relating to its determination permitting Ross to remove the parties' minor child to

- 952 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

California and in ordering Jessica to pay child support. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

Jessica and Ross met in 2009 while attending Arizona State University. In the summer of 2012, Ross entered a U.S. Air Force delayed-entry program, which allowed him to defer basic training until after the parties' marriage in February 2013. Ross entered Air Force basic training from March to May. After Ross completed basic training, he was stationed in Monterey, California, where Jessica joined him.

The parties lived in Monterey until October 2014, when Ross was stationed at Goodfellow Air Force Base in San Angelo, Texas, for intelligence training related to his linguist job. During the period of time that Ross was in San Angelo, Jessica lived with her parents in Nebraska. Once Ross completed his training in San Angelo, he and Jessica moved to Maryland, where he was stationed at Fort George G. Meade. The parties' daughter, Penelope Sue Couchman (Penny), was born in 2015.

In January 2018, while still residing in Maryland, the parties began experiencing marital difficulties. On January 27, the parties went on a "date night" during which Ross discovered that Jessica had an online dating application, Tinder, on her phone. Although Jessica initially attempted to deny having the application on her phone, she eventually admitted having the application and showed Ross that she had been communicating with approximately 10 men. Jessica told Ross that she "had Tinder in the past and had deleted it, and that she had just been using it to get compliments." The parties argued about Jessica's use of the Tinder application and returned to their home. During that evening, Ross and Jessica had a conversation, which he described as follows:

This conversation was about us filing for a divorce and what would happen, what the implications of that would be. [Jessica] said that she was planning on going to

- 953 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

Nebraska to be a teacher. And that she wanted to file a legal separation. I had stated in the past that I wanted a divorce if we were going to split. She said that it didn't matter if she was an alcoholic, it didn't matter if she had endangered Penny, it didn't matter about her mental health issues, that because I was in the military, the Court would not award me custody.

Ross further asked Jessica if she would admit to being on mental health medication and "bipolar medication," to which question he said she replied, "yep." He also asked her if she would admit "to endangering Penny by putting her in a car without a car seat," and he testified that Jessica responded "yep."

Ross testified that after this conversation, Jessica decided that she wanted to take Penny to stay with a friend who lived approximately 45 minutes away. Ross objected because it was late in the evening; Penny was sleeping; and, during the course of the evening, Jessica had consumed at least two beers before the parties left their home and then consumed one beer and a "flight of beers" consisting of five small glasses (or samples) of different beers while the parties were out on their "date." Ross eventually called the police, who advised Jessica that she should have her friend pick her up. After this incident, Jessica stayed in a hotel with her mother for a week, during which time Ross cared for Penny. When Jessica returned to the parties' home, Ross stayed in a rented room for 2 weeks. During this time, the parties attended marriage counseling and reconciled.

In late March 2018, Ross was scheduled to attend 2 months of officer training school (OTS) in Alabama. During the time period that Ross was attending OTS, the parties decided that Jessica and Penny would stay in Nebraska with Jessica's parents. On March 16, the parties left Maryland and drove cross country on their way to Nebraska. During a portion of the drive in Iowa while Jessica was driving, Ross asked her if she could change the music they were listening to. She handed Ross her phone and told him to "put on [their] wedding playlist."

- 954 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

Ross then "saw in her text messages that she was having a romantic conversation with a man . . . [a]nd from that point, [they] began to argue because [he] was upset that [his] wife was communicating with this man." Although Ross could not understand the other man's portion of the conversation because it was in Spanish, he knew that the conversation was romantic in nature "[b]ecause they were sending heart emojis and [he] could understand [Jessica's] parts of the conversation [which were in English]." Ross admitted that he "yelled at [Jessica]" and "called her some names," but stated that Penny was asleep and that he "was just hurt that the day [he] was getting ready to leave [for OTS], [his] wife was telling another [man] that she couldn't wait to [video call] him later and that [Ross] was getting on a plane soon."

After Jessica stopped the car, Ross dropped Jessica's phone from the passenger window into the grass outside the car. When Jessica left the driver's seat of the car to retrieve her phone, Ross, who was upset, got into the driver's seat of the car and "pulled [the car] forward approximate[ly] 100 feet to try and process what had just happened." Jessica got in the car, and the parties continued the drive to Omaha, Nebraska.

Once the parties arrived in Omaha, they continued to argue. The parties eventually got a hotel room for the night, but argued, and Jessica contended that Ross would not let her leave the hotel room and that he eventually shut the door on her leg. Ross stated that he was standing by the door and "tried to block it." The police were called several times over a 2-day period, but no citations were issued. Further, Jessica admitted that at trial, she testified regarding allegations which she had never previously mentioned to the police or included in any prior affidavits or statements.

Ross left Omaha and attended OTS in Alabama, which began on March 28, 2018. Ross testifed that during his time at OTS, he had access to his computer, "so some messaging was able to occur or e-mails with pictures, but the bulk of [the] communication" between Jessica, Ross, and Penny "was

- 955 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

via cards and letters." Ross further stated that Jessica asked him not to discuss her behavior and to limit their conversations to Penny and finances, but admitted that their communications were amicable.

On the night of April 17, 2018, which was Ross' birthday, he tried to call Jessica eight times. Jessica texted Ross "to stop trying to contact her." However, the following morning on April 18, Jessica allowed Ross to talk to Penny. One day later, on April 19, Jessica filed a domestic abuse protection order against Ross, alleging, among other things, that Ross continued to call her after she texted him to stop, that she was frightened of Ross, and that she did not want to have any further communication with him. A harassment protection order was entered in May 2018 in lieu of Jessica's requested domestic abuse protection order.

On April 22, 2018, 3 days after filing the application for a protection order against Ross, Jessica purchased an airline ticket, which Jessica admitted that she used to visit her boyfriend in Maryland. Ross was unaware that Jessica was flying to Maryland and later found out that Jessica allowed a third party to care for Penny while Jessica was out of state.

On May 8, 2018, Ross filed a complaint for legal separation, requesting, among other things, custody of Penny subject to Jessica's rights of reasonable visitation and permission to move with Penny to Texas. Jessica filed an answer and "counter complaint" that was subsequently amended to request, among other things, dissolution of the parties' marriage.

Shortly after the filing of the complaint for dissolution, Ross graduated from OTS on May 24, 2018, and was relocated to Texas. Jessica and Penny remained in Nebraska with Jessica's parents.

In June 2018, the court entered a temporary order granting the parties temporary joint legal and physical custody of Penny and setting a visitation schedule that provided for the parties to have a 2-week-on, 2-week-off visitation schedule with Ross' parenting time taking place in Texas. In the temporary

- 956 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

order, the court further noted "it did not find domestic abuse under the domestic abuse protection order as indicated by its dismissal and the entry . . . of a harassment protection order." Further, the court noted that "there [was] no credible evidence that either parent [was] a danger to the minor child, . . . and it is evident that each parent loves her." The court further noted:

> [Jessica] had accused [Ross] of trying to take the minor child to the exclusion of herself. Yet, given the current situation, she has managed to accomplish that end temporarily for herself and is now requesting that the Court allow that to continue. The Court declines to do so as it is not in the best interest of the child. The evidence presented to the Court established that the parties are very unhappy with each other. As such, until the protection order is modified or dismissed, the Court finds that the parties will need to exchange the minor child through a third party. In addition, while the protection order . . . remains in place, the parent that is not exercising parenting time will be unable to call the other party to interact with the child as that would be a violation of the protection order unless the parties are able to otherwise reach an agreement which can be submitted to the Court for approval.

A further temporary order entered in September 2018 provided for, among other things, video call communications between the parties and Penny on Mondays, Wednesdays, and Sundays "between the hours of 7:00 p.m. and 8:00 p.m., for a period of up to thirty (30) minutes. Calls may take place directly between the parties for this purpose only and shall not be considered a violation of any prior orders." The dissolution hearing was held in March 2019.

### 1. Trial Testimony

In January 2019, Ross received orders to report to Beale Air Force Base in California by March 2019. At the time

- 957 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

of the dissolution hearing, he was permanently stationed in California, north of Sacramento. Ross testified that his work hours were Monday through Friday, 7:30 a.m. to 4:30 p.m., and that his likelihood of deployment to a combat zone was "very minimal." The evidence further established that Ross' income had increased for the past 3 years.

Ross provided evidence regarding the apartment he had leased, which provided access to a tennis court and swimming pool. Ross testified that he had already arranged for daycare for Penny which was located .8 miles from his home and that he had researched the highly ranked elementary school that Penny would be attending the following year which was located .2 miles from his home.

Ross stated that during the calls he made to Jessica on his birthday, he did not make any threats or leave any messages that could be construed as threatening in any way. He further testified that he did not do anything to endanger his family or ever threaten family members with any type of bodily harm. However, Ross admitted that "throughout the course of the nearly 9 years [he and Jessica] were together, [they] had arguments where [they] called each other names, and just sometimes inappropriate curse words, but nothing outstanding. Just typical argument[s] between a married couple that would get heated."

Ross testified that he has never refused to allow video call communications between Jessica and Penny during his parenting time. However, Jessica was accepting phone and video calls only if the communication was made through a third party. Ross testified this demand was impractical for him because he did not have a roommate to assist with supervising the communication and he was informed by a Goodfellow Air Force Base family advocacy program that it was not possible to receive assistance with such a request. When Ross did communicate by video call with Penny, all calls went through Jessica's mother at Jessica's parents' residence because Jessica refused "any and all contact" with Ross. This arrangement

- 958 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

required Jessica to drive Penny to Jessica's parents' home at
around 7 p.m. and then back to Jessica's apartment as late as
8 p.m. Ross explained that he thought that arrangement caused
Penny stress around the time she should be going to bed.

Despite the temporary court order that medical appoint-
ments for Penny were supposed to be agreed upon by the par-
ties and held at a time where both parties were able to attend,
Ross explained:

> [Jessica] was taking Penny to medical appointments here
> in Bellevue and never telling me in advance. She took
> [Penny] to an appointment in May, one in July, and another
> in November, and I was never notified of them. She then
> tried to take her to a counselor . . . and you were notified
> via her counsel of this appointment, and we objected to it.
> And they continued to insist that they were going to take
> her [anyway], so I contacted [the counselor's office] and
> told [the counselor] that as Penny's father, it had nothing
> to do with [the counselor] as a professional, but I was not
> consenting to a counselling appointment because we had
> requested why that counselling appointment was even
> made, and we were ignored.

Ross also identified another counseling appointment for Penny
that Jessica scheduled the day before the parties' December
7, 2018, hearing despite his objections and despite the fact
that he had made an appointment for Penny for the day of
the hearing. Despite Ross' objection, Jessica took Penny to
the December 6 appointment and told Ross that if attending
the appointment "was so important to [Ross], [he] should have
taken a day off on the day before the hearing." Then, after
the court requested an evaluation of Penny, Ross made an
appointment with a doctor, which fact he attempted to com-
municate to Jessica. However, Jessica made an appointment
with another doctor. After learning of the duplicative appoint-
ments, Ross asked Jessica to cancel the appointment she made
with the doctor because the appointment was for therapy, not
an evaluation. Jessica "again ignored" the request. Ross called

- 959 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

the doctor's office on the day and at the time of Penny's scheduled therapy appointment, but Jessica "no-showed" for the appointment. Ross also testified that he had provided any medical paperwork requested for any of Penny's medical appointments where he had accompanied her.

Ross testified that during Jessica's February 2019 deposition, Jessica admitted that she had started smoking during this case and that she had started drinking alcohol five times per week. Ross also testified that shortly after Penny's birth in 2015, Jessica was diagnosed with postpartum depression and anxiety for which she had been prescribed medication, and that Jessica stated "she thought she might be bipolar." Jessica admitted that she suffered from postpartum depression after Penny's birth, but denied having any other mental illness. She further disagreed with Ross' testimony regarding her alcohol use, stating that she did not drink five times per week, but had five drinks per week.

Jessica testified that when she and Penny first moved back to Nebraska, they resided with Jessica's parents; however, in December 2018, Jessica and Penny moved into a two-bedroom, two-bathroom apartment. Jessica admitted that she did not disclose this change in her living arrangement until her February 2019 deposition. Jessica testified that she intends to remain in Nebraska indefinitely.

Jessica testified that it was in Penny's best interests for her to be awarded sole legal and physical custody:

I have always been her primary caretaker. Now, that she's lived here for about a year, she's becoming very established here with her daycare. Like we already discussed, both my parents live 5 minutes from where we live. My brother, his wife, and their two kids who are Penny's cousins, they live 5 minutes from our place as well. A lot of my extended family lives just across the [border] in Iowa, so Penny is able to see my grandma regularly or grandmas and then other younger cousins. I have the teaching position, which has a good schedule. I get off

- 960 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

of work every day at 3:05 [p.m.], and I'm able to go pick up Penny and spend the good part of the afternoon and evening with her. And then lots of breaks interspersed throughout the year and long weekends that if she's not spending with [Ross], it just is additional time . . . that I would get to spend with her.

Jessica also testified that Penny has extended family in Nebraska, including her maternal grandparents, an aunt, an uncle, and cousins. According to Jessica, Penny sees her grandparents several times per week and sees her cousins on a weekly basis.

Jessica also testified that she believed that it was not in Penny's best interests for physical custody to be awarded to Ross in California:

I think that [Ross'] support system might not be as great. I don't know in three to four years after this duty station where he would be expected to go next. And I feel like I have a more positive relationship with our daughter, and I still have some of those concerns based on my own experiences with him as a husband and some of the interactions I have seen him have with our daughter, and since she's been born, I just get concerned about his level of patience and things like that.

However, on cross-examination, Jessica admitted that during a February 2019 deposition, she had stated that Ross was a fit parent and that she did not have any concerns about his parenting of Penny. Jessica stated that there was "no reason" for the change in her testimony, just that her trial testimony represented her "beliefs." She further admitted that it was just her opinion that her relationship with Penny was better than Ross' relationship with Penny.

Further, Jessica admitted that 2 days after filing for a domestic abuse protection order, she bought airline tickets to return to Maryland to visit the man with whom she was having an affair, leaving Penny in the care of her parents. At one point when Jessica went to a clinic to have a medical procedure

- 961 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

performed, she left Penny in the care of a third party whose last name she could not remember. Jessica further admitted that the domestic abuse protection order was converted to a harassment protection order by the district court and further admitted that there had never been a ticket issued against Ross or any findings by the Air Force regarding any evidence of domestic abuse.

## 2. Dissolution Decree and Postdecree Motions

In July 2019, the district court entered an order dissolving the parties' marriage and, among other things, awarding Ross and Jessica joint legal custody of Penny, with primary physical custody awarded to Ross with permission to reside with her in California subject to Jessica's parenting time as set forth in the parenting plan. The court ordered Jessica to pay $576 per month in child support, commencing retroactively as of April 2019. The court specifically stated, "Having viewed the witnesses and determined their credibility[,] the Court finds [Ross] to be credible and [Jessica] to be not credible," and it made specific findings related to Ross' request to remove Penny to California.

Specifically, the district court found that Ross had a legitimate reason for moving to California "as his Orders from the Air Force required this move." In determining that it was in Penny's best interests to live with Ross in California, the court conducted the following best interests analysis:

> a. [Ross] proved he was best suited to provide for the minor child's emotional, physical, and developmental needs. The parties had, while still together, equally shared in the care of the minor child and since awarded parenting time in this case, [Ross] has shown he can provide for all [her] needs independently. This factor favors [Ross'] having primary possession [of] the minor child in California.

- 962 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

b. Due to the age of the child, her opinion was not offered and was not considered by the Court.

c. [Ross] was able to prove enhanced income by remaining in the Air Force pursuant to his Orders and this factor favors the move to California.

d. Improved Housing: [Ross] provided the Court [with] evidence of good housing, and nearby schools that were highly rated. [Jessica] provided little or no documentation regarding the quality of her housing or schools near her home. The Court finds this element slightly favors the move to California.

e. Educational Advantages: [Ross] provided evidence that the minor child will have access to good schools within .2 miles of [Ross'] home and can begin school next year. [Jessica] provided little or no documentation regarding the quality of schools, but when the minor child is with her the travel requirements to get her to school increase[]. This factor favors the move to California.

f. Quality of Relationship with Each Parent: There is no credible evidence that the minor child has a better relationship with one parent over the other. This factor is neutral.

g. Whether the Move Would Antagonize the Relationship: [Ross] never lived in Nebraska and there is no evidence that the move to California would antagonize the relationship. This factor is neutral.

h. Connections to the Community and Family Ties: [Ross] is originally from California and that is where his family resides. [Jessica's] family is from both Nebraska and Iowa. There was little evidence of ties to the community, other than family ties due to the minor child's age. This factor is neutral.

i. Other factors the Court Considered in Determining the Best Interest:

i. History of Abuse: [Jessica] raised the issue of abuse as a reason that she should be awarded custody of the

- 963 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

minor child. While there was evidence of marital arguments that at times were heated, the Air Force investigation and Court found no credible evidence to support [Jessica's] claims of abuse during the marriage.

ii. <u>Moral Fitness:</u> The Court believes the totality of evidence presented proves that [Jessica] had several moral lapses that are concerning and point to poor decision making, deceit and putting her own needs and wants above the minor child at times.

Following the entry of the dissolution decree, Jessica timely filed a motion for new trial which she subsequently amended to a motion for new trial or, in the alternative, a motion to alter, amend, or reconsider. In the amended motion, Jessica alleged that certain findings by the court were not sustained by sufficient evidence and that errors of law had occurred, including, among other things, the court's order that she should pay child support commencing in April 2019 and its use of different percentages for cost sharing throughout the decree.

On December 31, 2019, the district court denied the majority of Jessica's amended motion for a new trial and motion to alter, amend, or reconsider, finding as follows:

[E]ach of [Jessica's] claims [was] without merit with the exception of one argument set forth and agreed to by [Ross]. Specifically, [Jessica] asserts that her child support obligation should begin on July 31, 2019[,] as opposed to April 2019. [Ross] agrees. Further, [Jessica] asserts that the percentage of expenses that she is obligated to pay should be set to a flat rate. [Ross] agrees and proposes [that] the percentages shall be set at [Jessica's] requested rates of 43% for [Jessica] and 57% for [Ross]. The Court finds that the Decree should be amended to reflect the following aforementioned provision.

All other provisions of the July 19, 2019, Decree of Dissolution if not modified herein, shall remain in full force and effect as set forth in that Decree.

Jessica has timely appealed to this court.

- 964 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

## III. ASSIGNMENTS OF ERROR

On appeal, Jessica contends that the district court abused its discretion in (1) finding that Ross had a legitimate reason for his move to California, (2) permitting Ross to remove Penny from Nebraska to California, (3) factoring Jessica's moral character into the court's best interests analysis, (4) failing to factor Ross' alleged history of abuse into its best interests analysis, and (5) ordering her to pay child support.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or its action is clearly against justice or conscience, reason, and evidence. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005).

[3] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015); *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018).

## V. ANALYSIS

### 1. Review of Removal Jurisprudence

Before addressing the merits of Jessica's first four specific allegations of error, we note that Jessica did not assign as error, or argue, that the district court erred in awarding the parties joint legal custody of Penny or in awarding sole physical custody of Penny to Ross. Jessica's assignments relate solely to specific findings by the court in connection with its

- 965 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

removal analysis. However, we question whether a separate removal analysis is necessary in circumstances such as those presented by this dissolution case where the parent who is awarded physical custody of a child has never resided in the State of Nebraska. In reaching our conclusion regarding whether a removal analysis is required under these facts, we recount prior case law which has discussed the necessity of a removal analysis under different factual circumstances.

[4,5] In *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), the Nebraska Supreme Court discussed the appropriate factors to consider in determining whether to permit a custodial parent to move with a child to a different state, hereinafter referred to as the "*Farnsworth* analysis." That parent, a mother who had previously been granted physical custody of the parties' minor child, filed an application to modify the custody order such that she be permitted to move with the child from Nebraska to Denver, Colorado, so that she could accept a new job opportunity. The Supreme Court ultimately affirmed the decision of the district court to modify the previous custody order to allow the mother to remove the child from Nebraska to Colorado. *Id*. In reaching this decision, the court reiterated that to prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. See *id*. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id*. The factors to be considered in determining whether removal is in the child's best interests include each parent's reasons for seeking or opposing the move, the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and the impact the move will have on contact between the child and the noncustodial parent. *Id.*

Subsequently, in *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013), this court applied the *Farnsworth* analysis to a paternity action

- 966 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

where a noncustodial parent filed an application to modify custody such that he be awarded custody and be permitted to move the parties' minor children to Wyoming, where he resided. In *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, *supra*, the parents, who were never married, had initially agreed to allow the mother to have sole physical custody of the children. The mother and the children thereafter resided in Nebraska, while the father resided in Wyoming. The father later filed an application to modify, requesting that physical custody be awarded to him, and that he be permitted to move the children to Wyoming. The district court granted the father's application to modify. *Id.* The district court indicated that a material change in circumstances had occurred warranting a change in custody and that a change in custody was in the best interests of the children. *Id.* Then, the court conducted a separate analysis to determine whether removal was also appropriate. *Id*.

[6] On appeal, we affirmed the decision of the district court. *Id.* In our analysis, we first noted that the case presented a question of first impression because the parent seeking removal was the noncustodial parent. *Id*. We then held:

> [I]n cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate.

*Id.* at 419, 838 N.W.2d at 360. Our analysis in *State on behalf of Savannah E. & Catilyn E. v. Kyle E., supra*, clearly directed trial courts to conduct a *Farnsworth* analysis prior to making a decision regarding removal in a modification action, even if a material change of circumstances has been found and the trial court has concluded that a change of custody is in the children's best interests.

- 967 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

In contrast, the Supreme Court has determined that a *Farnsworth* analysis is not necessary in analyzing an initial custody determination in a paternity action. In *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004), a father who lived in Texas sought custody of his child who had been living with her mother in Nebraska. The parents had never been married, and no prior custody determination had been made in any court. Ultimately, the trial court awarded custody of the child to the father and allowed the child to reside with the father in Texas. On appeal, the mother argued that the district court should have conducted a *Farnsworth* analysis before permitting the father to remove the child from Nebraska. The Supreme Court distinguished the facts in *State on behalf of Pathammavong v. Pathammavong, supra*, from the facts in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), because in *State on behalf of Pathammavong v. Pathammavong, supra*, there was no request for parental relocation or modification of a previous custody order. Since the court order appealed from was the first order awarding custody to one parent or the other and the parties already lived in different states, the Supreme Court found that the issue was not whether a parent should be able to relocate with a child, but which parent should be awarded permanent custody of the child as a matter of initial judicial determination. The court stated, "This question must be resolved on the basis of the fitness of the parents and the best interests of the child." *Id*. at 6, 679 N.W.2d at 755. As a result, the court found "the district court was not required to apply the *Farnsworth* [analysis] in resolving the disputed custody issue in this case." *Id*. at 7, 679 N.W.2d at 755.

[7] This court followed the Supreme Court's decision in *State on behalf of Pathammavong v. Pathammavong, supra*, in a subsequent paternity case in which the father sought to prevent the mother from removing the children from Nebraska when there was no prior custody order. *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). See, also, *Westerhold*

- 968 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

*v. Dutton*, 28 Neb. App. 17, 938 N.W.2d 876 (2020). In
*Coleman v. Kahler*, we held, "Nebraska's removal jurispru-
dence does not apply to a child born out of wedlock where
there has been no prior adjudication addressing child cus-
tody or parenting time." 17 Neb. App. at 529, 766 N.W.2d at
150. Accordingly, we declined to conduct a full *Farnsworth*
analysis in reviewing the trial court's award of custody to the
mother, who by that time lived outside of Nebraska. However,
we explained that in determining the child's best interests, it
would not be inappropriate to consider the relevant factors of
the *Farnsworth* analysis. As a result, we gave "some consid-
eration" to these factors in reviewing the trial court's custody
determination. *Coleman v. Kahler*, 17 Neb. App. at 529, 766
N.W.2d at 150.

Contrary to the Nebraska Supreme Court's holding that
a *Farnsworth* analysis is not necessary in an initial custody
determination in a paternity action, it has strictly applied the
*Farnsworth* analysis to initial custody determinations in dis-
solution actions when one party requests to move the child
from Nebraska. In *Kalkowski v. Kalkowski*, 258 Neb. 1035,
607 N.W.2d 517 (2000), the district court entered a decree
of dissolution which awarded custody of the parties' minor
children to the mother, but denied her request to move with
the children from Nebraska, where she and the father cur-
rently resided, to Canada, where the mother had grown up.
On appeal, the Nebraska Supreme Court affirmed the decision
of the district court after conducting a complete *Farnsworth*
analysis. *Kalkowski v. Kalkowski, supra*.

This court has followed the Supreme Court's decision in
*Kalkowski v. Kalkowski, supra*, that a complete *Farnsworth*
analysis is necessary in an initial custody determination
made during dissolution proceedings. See, e.g., *Rommers v.
Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014). In
*Rommers v. Rommers, supra*, the mother moved with the minor
child from Nebraska to Arizona prior to filing for a dissolution
of marriage. After the father initiated dissolution proceedings

- 969 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

in Nebraska, the trial court awarded physical custody of the minor child to the mother and allowed the mother to continue residing in Arizona. However, the trial court determined that because there had been no prior custody determination, it was not required to engage in a complete *Farnsworth* analysis in deciding to allow the mother and child to reside in Arizona. *Rommers v. Rommers, supra*. On appeal, we affirmed the trial court's decision to award the mother with physical custody, but reversed, and remanded regarding whether the mother should be permitted to remove the child from Nebraska. We explained that after the trial court made its initial custody determination, a full *Farnsworth* analysis was necessary to determine the issue of removal. *Rommers v. Rommers, supra*. We remanded the matter to the district court for a determination regarding whether the mother had a legitimate reason to leave the state and whether removal was in the child's best interests. *Id*. In our analysis, we specifically found that the mother should not gain the benefit of avoiding a complete *Farnsworth* analysis by leaving Nebraska with the child prior to seeking custody in the court system. *Rommers v. Rommers, supra*.

Similarly, in *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016), this court held that with respect to an initial custody determination in a dissolution action where both parents reside in Nebraska, the trial court must first make a determination regarding physical custody. Once that determination is made, the trial court must complete a *Farnsworth* analysis to determine whether the parent awarded physical custody may remove the children from Nebraska. In *Hiller v. Hiller, supra*, the trial court had indicated that it was not required to consider the factors ordinarily considered in removal cases, as there was no prior custody order. However, the court did discuss and consider each of the "traditional" factors of the *Farnsworth* analysis. The court ultimately awarded physical custody of the children to the mother and permitted her to move with the children to Virginia to accept new employment. *Hiller v. Hiller, supra*. On appeal, we affirmed the decision of the

- 970 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

district court to allow the mother to remove the children from Nebraska, but we found error with the trial court's conclusion that the *Farnsworth* analysis need not be strictly applied. *Hiller v. Hiller, supra*.

In *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018), we applied a complete *Farnsworth* analysis to a situation where the mother and child resided in Nebraska at the time of the initiation of the dissolution proceedings, but the father resided in a different state. In that case, the parties were married in Nebraska and initially lived in Nebraska where their child was born. Subsequent to the child's birth, the entire family moved to England as a result of the father's military service. While in England, the parties decided to separate and the mother and child returned to Nebraska, where the mother initiated dissolution proceedings. Following a trial, the trial court awarded sole custody of the minor child to the father, who was then stationed in Arizona. The court indicated that the child should be permitted to move to Arizona to reside with the father.

On appeal, we affirmed the order of the trial court. See *Kashyap v. Kashyap, supra*. In our analysis, we first reviewed the trial court's decision to award the father with sole custody. We then turned to the court's decision to allow the child to live with the father in Arizona. We conducted a full *Farnsworth* analysis, including a discussion of whether the father had a legitimate reason to leave the state and whether the removal was in the child's best interests. However, we did not explicitly address whether such an analysis was required, given that the father did not live in Nebraska at the time the dissolution proceedings were entered or at any point thereafter.

Recently, in *Olson v. Olson*, 27 Neb. App. 869, 937 N.W.2d 260 (2019), we were presented with circumstances factually similar to the present case. Therein, the parties were married in Minnesota, where one child was born to them. They separated approximately 4 years later, and at that time, the mother moved to Nebraska with the child. Approximately 13 years

- 971 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

later, the father filed for dissolution, seeking custody and permission to move the child back to Minnesota. Following trial, the trial court found that sole custody should be awarded to the father. The court stated in its decree, "'To a certain extent, I do think I'll do some type of *Farnsworth* analysis. . . . It's still a removal from the state and I think I have to take that analysis into consideration . . . .'" *Olson v. Olson*, 27 Neb. App. at 885, 937 N.W.2d at 273. On appeal, the mother asserted that the trial court erred in failing to perform a complete *Farnsworth* analysis. We indicated that "the district court, to the extent it was required to, did conduct an appropriate *Farnsworth* analysis under the circumstances." *Olson v. Olson*, 27 Neb. App. at 886, 937 N.W.2d at 273. We made no explicit finding of whether a full application of the factors of the *Farnsworth* analysis was necessary, but we did conduct a complete *Farnsworth* analysis and affirmed the decision of the district court, which awarded sole custody to the father and permitted the father to move the child back to Minnesota.

Like in *Olson v. Olson, supra*, the present case involves an original dissolution action where one parent has never resided in Nebraska and is requesting physical custody such that the child must move from Nebraska to that parent's home state. Here, the parties met and married in Arizona. Penny was born in Maryland. At the time of the dissolution proceedings, Jessica was residing in Nebraska with Penny. Ross was residing in California. In awarding custody of Penny to Ross, the district court did not conduct a strict *Farnworth* analysis, which would have required making a custody determination first and only then determining whether Ross had a legitimate reason to move to California and whether moving to California was in Penny's best interests. Instead, the court combined its custody and removal analyses by applying factors relevant to both inquiries. Given the circumstances presented in this case, and given our review of the case law, we believe the district court conducted an appropriate analysis when determining to award custody of Penny to Ross in California.

- 972 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

We find that when a court is making an initial custody determination in a dissolution case where one of the parties has never resided in Nebraska, a separate *Farnsworth* analysis is not necessary when awarding physical custody to the out-of-state parent. When one parent has never resided in Nebraska, we see no reason to add an additional burden to that parent to not only prove that it is in the child's best interests that he or she should receive custody, but then have to jump the additional hurdle of prevailing under a *Farnsworth* analysis. In so finding, we recognize that most, if not all, of the best interests factors of the *Farnsworth* analysis are still relevant to the court's custody decision. However, those factors should be applied within the framework of the custody analysis in this scenario.

Moreover, we see little if any utility in requiring the out-of-state parent to prove a legitimate reason to leave the state. Here, as in *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004), one of the parents has never lived in Nebraska. The issue before the court is not whether that parent should be allowed to relocate with the child, but who should have custody. Therefore, we find that in an initial custody determination as part of a dissolution action, the out-of-state parent shall not be required to prove a legitimate reason to leave the state.

In reaching our decision, we recognize that we have somewhat departed from our opinion in *Olson v. Olson*, 27 Neb. App. 869, 937 N.W.2d 260 (2019), wherein we conducted a full *Farnsworth* analysis even though the parent who was ultimately awarded physical custody had never resided in Nebraska. However, in *Olson v. Olson, supra*, we did indicate that under the specific facts of that case, such a full *Farnsworth* analysis may not have been necessary. In addition, we distinguish the facts of this case from the facts present in our decision in *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018), where the out-of-state parent had previously lived in Nebraska when the parties were married and

- 973 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

when the child was born. We reiterate that our decision not to require a full *Farnsworth* analysis in original dissolution proceedings is limited to those circumstances where one of the parents does not reside, nor has ever resided, within the State of Nebraska.

## 2. Jessica's Specific Assigned Error Regarding Removal

Given our decision that a separate *Farnsworth* analysis regarding removal is not necessary in this case because Ross has never resided in the State of Nebraska, we must now decide whether, and how, to address Jessica's assignments of error which on their face appear to relate only to the district court's decision to allow Penny to reside with Ross in California, rather than the court's decision to grant custody of Penny to Ross. The difficulty with Jessica's assignments of error is that they presume that separate custody and removal analyses were made in this case and were required. The district court, however, combined its analyses of custody and removal factors and made a combined finding that physical custody be awarded to Ross with permission to remove. The factors analyzed and recounted in the decree as to best interests include both the best interests factors of the *Farnsworth* analysis and other relevant factors. Since the court combined its custody and removal analyses and we have endorsed the court's approach herein, we find that it is appropriate for us to review Jessica's assignments of error as they relate to the district court's ultimate decision.

Here, in her first four assignments of error, Jessica specifically argues that the district court erred in (1) finding that Ross had a legitimate reason for his move to California, (2) permitting Ross to remove Penny from Nebraska to California, (3) factoring Jessica's moral character into the court's best interests analysis, and (4) in failing to factor Ross' alleged history of abuse into its best interests analysis. Therefore, we will consider whether the district court abused its discretion

- 974 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

by concluding it was in Penny's best interests to be placed into Ross' custody in California and we will address each of Jessica's specific claims.

### (a) Legitimate Reason for Leaving State

Jessica first claims that the district court erred in determining that Ross had a legitimate reason for leaving the state, because the "only piece of evidence submitted at the time of trial was a Request and Authorization for Permanent Change of Station — Military." Brief for appellant at 13. As we discussed above, this specific assignment of error relates to the first factor in a full *Farnsworth* analysis when a removal analysis is warranted. Because a full removal analysis is not warranted under these facts, this factor is not germane to deciding whether it was in Penny's best interests to be placed in Ross' custody. Because this factor was not relevant to the court's analysis, this specific assignment of error fails.

### (b) Permitting Ross to Remove Child
### From Nebraska To California

Jessica next argues that the court erred in permitting Ross to remove Penny from Nebraska to California. Because we previously held that a formal removal analysis is not warranted, but found that some, if not all, of the factors of the *Farnsworth* analysis should be considered by a court in making an initial custody determination of this nature, we liberally construe Jessica's assignment to mean that the district court improperly weighed the factors it considered in reaching its custody decision here. In making its best interests determination, the district court appeared to apply the factors set forth in the second prong of the *Farnsworth* analysis, that is, the factors normally used to determine the potential the move holds for enhancing the quality of life for the child and custodial parent.

[8] These quality of life considerations identified by the Nebraska Supreme Court include (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the

- 975 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). The court specifically noted that this list did not set out a hierarchy of factors and that depending on the circumstances of a particular case, any one factor or combination of factors could be variously weighted. *Id*.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

- 976 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

Because the *Farnsworth v. Farnsworth, supra*, quality of life considerations analyzed by the district court were relevant considerations in this best interests analysis, we will briefly review those here, as those considerations relate to Jessica's general assignment that the court erred in analyzing them.

The first factor is the emotional, physical, and developmental needs of the child. The district court found that this factor favored Ross' having primary possession of Penny in California because Ross had proved he was best suited to provide for Penny's emotional, physical, and developmental needs. The court noted that while the parties were still together, they had shared equally in Penny's care, and that since being awarded parenting time, Ross has shown he can provide for all of Penny's needs independently. We agree with the court's determination and add that the record reflects that Ross demonstrated that he was willing to enable Penny to foster a good relationship with Jessica, whereas Jessica attempted to thwart Ross' relationship with Penny. It is in Penny's best interests emotionally, physically, and developmentally to be in California with Ross. This factor weighs in favor of custody with Ross in California.

The second factor is the minor child's opinion or preference as to where to live. The district court found that this factor was neutral because, due to the young age of the child, her opinion was not offered and was not considered by the district court. We agree that this factor is neutral.

The third factor is the extent to which the custodial parent's income or employment will be enhanced. We agree with the district court's finding that this factor favors custody with Ross in California because Ross was able to establish enhanced income and career opportunities by remaining in the Air Force pursuant to his orders.

The fourth factor is the degree to which housing or living conditions would be improved. The evidence supports the district court's findings that Ross provided evidence of good housing and nearby schools that were highly rated, whereas

- 977 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

Jessica provided little or no documentation regarding the quality of her housing or the schools near her home. We agree with the district court that this factor slightly favors custody with Ross in California.

The fifth factor is the existence of educational advantages. The district court found that Ross provided evidence that Penny would have access to good schools within .2 miles of Ross' home and could begin school the following year, whereas Jessica provided little or no documentation regarding the quality of schools where she would seek to enroll Penny. Jessica's limited testimony in this area was that if Penny is with her, her travel requirements to get Penny to school will increase. We agree that this factor favors custody with Ross in California.

The sixth factor is the quality of the relationship between the child and each parent. We agree with the district court's finding that this factor is neutral because there was no credible evidence that Penny had a better relationship with one parent over the other.

The seventh factor is the strength of the child's ties to the present community and extended family there. The court found that Ross was originally from California and his family resides there, even if several hours away; Jessica's family is from both Nebraska and Iowa; and there was little evidence of ties to the community other than family ties due to Penny's young age. We agree with the district court that this factor is neutral.

The eighth factor is the likelihood that allowing or denying the move would antagonize hostilities between the two parents. We agree with the district court's finding that this factor was neutral, as Ross had never lived in Nebraska and there was no evidence that the move to California would antagonize the parties' relationship.

The ninth factor is the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. The district court did not specifically make a finding regarding the ninth factor, but the court did consider

- 978 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

Ross' living conditions and employment opportunities within the third and fourth factors and noted that California provided increased employment opportunities for Ross and good living conditions. We find that this factor weighs in favor of removal to California.

After reviewing this record, we conclude that the district court considered all relevant *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), considerations in connection with its best interests analysis and did not abuse its discretion in finding those factors weighed in favor of placing custody of Penny with Ross. Accordingly, Jessica's second assignment of error fails.

(c) Best Interests

Jessica's next two assignments of error allege that the district court abused its discretion in failing to consider Ross' prior history of abuse and in factoring her moral character into the court's best interests analysis. In considering whether custody with Ross in California was in Penny's best interests, the district court specifically addressed the factors of Ross' alleged history of abuse and Jessica's moral fitness.

Regarding Jessica's claim that the district court erred in failing to factor Ross' alleged history of abuse into its analysis, the record clearly demonstrates the opposite. The court's order states that "[w]hile there was evidence of marital arguments that at times were heated, the Air Force investigation and Court found no credible evidence to support [Jessica's] claims of abuse during the marriage." The court further noted in its order that it did not find Jessica to be credible. In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015); *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). In this instance, we consider and give weight to

- 979 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

the fact that the district court heard and observed the witnesses and accepted Ross' version of the facts in making this determination.

Jessica also claims that the district court erred in factoring her moral character into the best interests analysis. Jessica cites case law similar to that set forth in *Anderson v. Anderson*, 5 Neb. App. 22, 554 N.W.2d 177 (1996), in which this court noted that when litigants seek to use a custodial parent's sexual activity as a basis for a change in custody or custody arrangements, the Nebraska Supreme Court has repeatedly found the overriding factor to be whether the children are directly exposed to sexual activity or whether there is other proof that the children are adversely affected. Jessica then argues that Ross "never produced any evidence [that her extramarital affair had] a negative impact on [Penny]." Brief for appellant at 25. However, Jessica ignores the district court's findings of other instances of other "moral lapses." The district court stated in its order that it "believes the totality of evidence presented proves that [Jessica] had several moral lapses that are concerning and point to poor decision making, deceit and putting her own needs and wants above the minor child at times." We again note that the district court heard and observed the witnesses and note that the evidence provided several instances of questionable judgment by Jessica, including, but not limited to, attempting to drive a car with Penny in it after drinking alcohol, driving a car with Penny in it but without her car seat, lying to her parents about the reason for her trip to Maryland, and leaving Penny with a third party whom she could not readily name. The aforementioned factors do not relate solely to Jessica. Instead, these factors related directly to Penny's well-being. Accordingly, these matters were relevant to the court's consideration and the court did not err in considering these factors.

### 3. CHILD SUPPORT

Jessica's final assignment of error is that the district court abused its discretion in ordering her to pay child support.

- 980 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
TAYLOR-COUCHMAN v. DeWITT-COUCHMAN
Cite as 29 Neb. App. 950

However, her argument is based solely on her argument that "the court abused its discretion in permitting [Ross] to remove [Penny] from the jurisdiction." Brief for appellant at 27-28. Having determined that the district court did not abuse its discretion in awarding physical custody of Penny to Ross, we conclude this assignment of error necessarily fails.

## VI. CONCLUSION

For the reasons set forth herein, we affirm the July 2019 dissolution decree as modified by the court's December 31 order.

AFFIRMED.