IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

ADAMS V. FULLER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JAMAR ADAMS, APPELLEE,

V.

ERIKA FULLER, APPELLANT.

Filed December 17, 2024.    No. A-24-060.

Appeal from the District Court for Douglas County: TODD O. ENGLEMAN, Judge. Affirmed.

Kelly T. Shattuck, of Vacanti | Shattuck | Finocchiaro, for appellant.

Jamie E. Kinkaid, of Spectre Law, L.L.C., for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Jamar Adams and Erika Fuller stipulated to a February 2021 order establishing paternity, child custody, and child support; it granted the parties joint legal custody of their son, with physical custody awarded to Erika. She was also permitted to relocate with the parties' son to California. In November 2022, Jamar filed a contempt action against Erika, followed by a modification action. Following 2 days of trial, the Douglas County District Court entered a modification order that maintained joint legal custody between the parties but gave Jamar final say as to medical and school decisions. The district court awarded the parties joint physical custody, but with the child's primary residence being with Jamar in Nebraska. The court also found Erika in contempt.

Erika appeals. After a de novo review of the record, we cannot say that the district court abused its discretion. Accordingly, we affirm the court's January 2, 2024, order.

- 1 -

## II. BACKGROUND

The pleadings, trial testimony, and exhibits provide the following history and relevant details leading to the district court's January 2024 "Order of Modification."

### 1. PARTIES AND THEIR CHILDREN

The parties' son was born in February 2020 in Omaha, Nebraska. Although Jamar and Erika were in a relationship at various points in time, they never married and were not together when their son was born. Erika has two other children besides the parties' son -- an older son (age 10) and a daughter (age 13). Erika's older son resides with her in California, while her daughter resides with the daughter's father in Florida; the daughter visits Erika during summer and winter breaks.

In addition to the parties' son, Jamar has seven other children, including a 10-year-old daughter who lives with him. His other children are adults and all but one live in Nebraska.

### 2. FEBRUARY 2021 STIPULATED ORDER

On February 16, 2021, the parties entered into a stipulated order for paternity, custody, and child support. The Douglas County District Court entered an order awarding Jamar and Erika joint legal custody of their son, with Erika receiving sole physical custody. Erika was also granted permission to move to California with the parties' child effective March 1. Jamar was awarded "[r]egular" parenting time from the last Sunday of each month until the following Wednesday, as well as certain holiday parenting time. Also, commencing in 2023, Jamar was awarded significant summer parenting time. Both parties were granted an additional 21 days of vacation time and agreed to give each other at least 14 days' notice prior to exercising that time. The parties agreed that Jamar would pay his own expenses to travel to California to exercise his regular parenting time. However, travel expenses for holiday and summer parenting time were to be split between the parties. To offset Jamar's travel costs, he was not ordered to pay child support. In addition to parenting time, the parties were awarded telephone contact with the child "each day while [he was] at the other parent's home, at reasonable times of the day and evening."

Jamar claimed that the parties did not strictly adhere to the order, while Erika claimed that they did. Nonetheless, the parties agreed that Jamar exercised his parenting time with the child prior to September 2022. Jamar admitted that he received more parenting time than what was provided for in the order. Jamar also stated that he provided financial assistance to Erika's entire household, although he was not required to do so.

### 3. EVENTS LEADING TO MODIFICATION

The parties began to have issues after Erika suffered a medical emergency on September 9, 2022, which resulted in her being transported by ambulance to an emergency room. According to Erika, she was "on FaceTime with a friend" while at work when she "grabbed a glass of water," "took a big gulp," and "it literally just got stuck," and the next thing she knew she "dropped to [her] knees." She remembered "trying to cough it up," but that was the last thing she remembered. She woke up and was "in the ER." According to her responses to interrogatories that were received into evidence, her "boss at the time" found her unconscious and performed "CPR while 911 was called." Jamar became aware of the medical incident the day after it occurred through a text

message sent by Erika's mother using Erika's phone. Jamar testified that the message read, "'Hey, this is [Erika's mother]' . . . 'Erika had an episode at work. She . . . passed out, she had to be resuscitated. She was taken to the ER by ambulance.'" Jamar said that he attempted to contact numerous individuals to obtain further information regarding Erika's health and the location of their son. However, most of his requests for information were unanswered. He learned that Erika's driver's license had been suspended; it was not reinstated until February 2023, but there was evidence indicating that she drove prior to its reinstatement.

Erika did not provide any medical records from the emergency facility where she was taken on September 9, 2022. However, a "telemedicine" document dated September 13 indicated that the evaluation was in follow up to the September 9 incident. The document noted that when Erika was at work, she "had [a] possible seizure-like episode and went unresponsive." During the telemedicine call, Erika reported feeling fatigued and "slightly nauseous." Erika described the September 9 incident as drinking water and feeling like she was "choking." Erika was referred for a neurology consultation. Erika testified that the neurologist had to "wean out if it was seizures or whatever . . . which is why my driver's license initially was suspended, because they had to make sure that I don't have seizures and I'm clear to drive." A Department of Motor Vehicles (DMV) form dated January 12, 2023, completed by a neurologist, described the incident as a "[c]hoking, resulted in fainting episode," and noted that the medical issue had been resolved. The neurologist cleared Erika to drive without restrictions.

Following the September 9, 2022, incident, Jamar offered to pick up the parties' son and take care of him until Erika recovered. Erika eventually agreed to the unscheduled parenting time but later texted Jamar to clarify that her decision was not because of her medical incident. Rather, she explained that it was important their son had time with his father. She further stated that she was not physically debilitated and that she "[has] helping hands around the clock." The parties met at Jamar's friend's house in Las Vegas, Nevada, a couple of weeks after Erika's emergency room visit. Jamar testified that Erika was driving when she dropped off their son.

The child stayed with Jamar for about a month. Issues arose when Jamar failed to return the child on the originally scheduled date of October 5, 2022. Jamar notified Erika that he needed to change the return date due to scheduling conflicts. On Saturday, October 8, Erika sent Jamar a text message saying she would pay for their son's return flight on Monday, October 10. Jamar responded that Monday would not work, but "[m]aybe Wednesday or Thursday." Erika had an attorney call Jamar to inquire about when he was going to return the child to California. Soon after, Jamar booked flights to return their son and provided Erika with the flight details. The child was returned to California on Thursday, October 13, 8 days later than originally scheduled.

On October 11, 2022, prior to the child's return to California, Jamar texted Erika, "This child is getting more hard[-]headed by the second. My spanks getting harder too and he don[']t care." At trial, he explained that typically, Erika "do[es] the spanking" and that he gave "ordinary spanking[s]" for a child of that age. A day after their son returned to California, Erika texted Jamar that their son had been "repeating some very disturbing words and phrases. One major being 'fucking' and saying 'don't fucking do that.'" At trial, Erika said their son was also using the "N" word and saying, "I'll kick your ass" and "shut the fuck up." At that time, their son was only 2 years old.

At the end of October and the beginning of November 2022, the parties exchanged text messages to schedule Jamar's next visit. Although they reached an initial agreement on when that would take place, their communication started to break down. Jamar then informed Erika that he would "exercise [his] right at bare minimum for November to take [their son] the last Wednesday of the month for a week . . . according to [their] order." Erika pointed out that the order only awarded him 3 days a month, with June being an exception. In response, Jamar stated that he would instead use vacation time and that his message was to serve as her 14 days' notice. At trial, he testified that he was "sure" he sent her an email providing proper notice as well. The exact date of when he provided notice is unclear. In an effort to communicate with his son, Jamar texted Erika on November 7, 10, 11, 12, 13, and 15. Erika ignored Jamar's messages, which she admitted at trial. The following colloquy occurred during her cross-examination.

[Counsel]: There came a time in November [when] you stopped allowing my client to talk to you guys' kiddo; is that correct?

[Erika]: Yes, there was a time.

[Counsel]: And you ignored his text messages?

[Erika]: Yes, [m]a'am, I did.

Jamar testified that he did not receive any parenting time in November.

### 4. California and Nebraska Proceedings

On November 7, 2022, Erika filed to register the parties' February 2021 order in California. However, Jamar asserted that he did not receive proper notice of this because Erika listed a Las Vegas address for him rather than his Nebraska address. Erika testified that her attorney advised her to file in California because she was under the impression that Jamar had moved to Las Vegas. She provided screenshots of text messages to support this belief. On September 2, Jamar texted Erika, "I'm also about to be taking on some new expenses now that I'm officially taking on this apartment in Vegas[,] moving in October 5th!" On October 29, he texted, "I'm finally all settled here in Vegas. This is ground zero now. Everything back home is in place as well! Just wan[n]a figure out what it looks like visiting [the child] now." On October 31, he provided his Las Vegas address to Erika. However, that same day, he clarified:

I just want to be clear [t]hat Nebraska is my home as well and my main home. . . . [The Las Vegas] place is only to get me closer to [the child] so I can have more quality visitation with him. . . . I will probably spend equal time at both places so I'm also seeing my children in Nebraska as well.

On November 22, 2022, Erika filed an emergency request in California to modify the Nebraska order, seeking sole legal and physical custody of the parties' son. (This was the same day Jamar filed a contempt action in Nebraska.) Erika alleged that Jamar "physically assaulted our son by spanking him several times," that he was "negligent in caring for our son, so much so that our son had a crayon lodged in his nose," and that he "left our son unattended in a vehicle while he went into a convenience store." She also claimed that the parties' son "made several serious and disturbing statements," such as his dad "hurt my booty," and he refused to speak with his father after returning from his last visit with Jamar. Erika alleged that Jamar was scheduled to visit

their son on November 27 and that "without immediate intervention from this Court, our son's safety is at risk." In addition to requesting sole legal and physical custody, Erika requested "professional supervised visitation." She added that Jamar was supposed to return their son to her on October 5 but did not. Erika claimed that Jamar had a "severe anger problem," was "incapable of parenting," was "dangerous," and had a "concerning criminal history and gang affiliation."

A hearing took place in California on November 23, 2023; Erika appeared in person and Jamar appeared telephonically. The court determined that it had jurisdiction over the matter and ordered that Jamar's visits be professionally supervised, allowing up to 4 hours each week. The court also ordered the California Department of Public Social Services to conduct an investigation regarding the parties' son, specifically in reference to the allegations of child abuse and/or neglect. The agency reviewed the parties' criminal histories and conducted interviews with Erika, Jamar, the parties' son, and a few of Jamar's adult children. It issued a report on January 11, 2023, ultimately finding that "there [were] no immediate safety concerns as to [Jamar's] home" and "there was no physical evidence to support allegations of general neglect as to [their son]."

On November 22, 2022, the same day Erika filed her emergency request described above, Jamar filed an application for an order to show cause in Nebraska. He claimed that Erika failed to facilitate parenting time between their son and him. The district court issued an order to show cause on November 23. On November 30, Jamar also filed a complaint to modify the February 2021 order. He alleged that there had been a material change in circumstances and that awarding him sole physical custody was in the child's best interests. He also requested an order requiring Erika to pay attorney fees. Jamar had difficulty getting personal service on Erika in California on the first order to show cause, so the court issued a second order to show cause on January 17, 2023, with a later hearing date. After "[s]everal diligent attempts" at personal service, Jamar filed a motion for alternative service on January 20, which the court granted.

On February 3, 2023, Erika filed a motion to dismiss in Nebraska, alleging that the parties had a "current custody case regarding this matter open in [California]" and that Jamar was aware of this action before filing in Nebraska. Jamar filed an objection to the motion to dismiss on February 8. A hearing was held on February 10, during which the parties were informed that the judges in California and Nebraska had conferred and decided that Nebraska had jurisdiction. The California court would dismiss its cases on February 28.

On February 17, 2023, Jamar filed an ex parte motion for physical custody of the parties' son, which the district court granted; an "Order for Warrant to Take Physical Custody of Minor Child (Ex Parte)" was signed and filed by the court on February 27. Jamar filed another motion for physical custody the next day. On March 6, Jamar went to California and asked the Menifee Police Department for help serving the warrant. They advised him that they could not enforce the warrant but that they were willing to assist him. Jamar and the officers went to Erika's residence and showed her a copy of the warrant. However, she refused to hand over the parties' son.

The next day, March 7, 2023, Erika sought a domestic violence protection order against Jamar in California. She did this having already being informed that Nebraska had jurisdiction over pending matters and that California was dismissing her cases. She alleged that Jamar was harassing her and "attempting to have [her] arrested," and that he had a "significant criminal record" and had "made a threat to kill [her] in the past." She reported that Jamar had "physically assaulted [their] son by spanking him several times," that she had been granted temporary custody

with Jamar having "professionally supervised visitation," and that the case was referred to "CPS for a 3027 report." She alleged that Jamar and the police showed up to her house the day prior and she told the police that she had a California order that gave her sole legal and physical custody. She found it "very concerning" that Jamar was trying to "remove our son from my care, against the current court order."

Erika also alleged there was an incident from 10 months prior in May 2022, and she included screenshots of text messages she received from Jamar following one of his California visits. Jamar's text stated that he was in "kill mode" and that he wanted to "choke [her] outta anger" and "treat [her] like a whore." Jamar later sent a text apologizing for "the words [he] chose." At trial, he clarified that he was referring to sex, and that they had sex the night before. "At this particular time, we . . . weren't together, but we were having sex" and "we've done choking before and all that, . . . during sex as well." The night prior to sending the text, he had "seen some things," such as "text messages and pictures and stuff" on her "Apple Watch" that indicated there were "conversations with several other guys," and "[s]he clearly . . . had sex and stuff . . .with them." Jamar was upset but did not yet tell her he had seen the messages. That night they were "trying to have rough sex" and "she wasn't having it." Regarding the text he sent the next day, he explained that "kill mode" means "rough sex." According to Jamar, when he was at the airport the next day, he told Erika what he saw "in [her] watch last night." She told Jamar to "[g]o ahead" and "vent . . . [g]et it off your chest." According to Jamar, "even after all this was done and over with . . . we were past it . . . we kind of said some apologies" and Jamar continued his "regular visits" with his son and he would sleep on the couch or bed while Erika was "in the room with the kids." There was "[n]ever" a time he was not welcome in Erika's home, so he did not "see why she would feel threatened by [him] even after sending that message, because she still allowed [him] back into the home."

Erika also raised issues related to Jamar's "handicapped son," which Jamar testified referred to a time before the parties' son "was even born" and the incident was not as described by Erika. Erika also described Jamar as "dangerous" with a "concerning criminal history and gang affiliation." Jamar explained that with one exception, his criminal history was all "well over a decade" old and that Erika was aware of it and still allowed him to be around their son and her other children. He acknowledged that he grew up and came from a life of "dishonest living," but that he had changed and that was "just not who [he was] to this day."

The California court issued a temporary restraining order against Jamar that same day, naming Erika and the parties' son as the protected parties. The order included a no-contact provision between Jamar and his son.

On March 8, 2023, the day after receiving the temporary restraining order in California, Erika filed a second motion to dismiss in Nebraska. She once again claimed that California had jurisdiction. A hearing on the parties' pending motions took place on March 10. Following the hearing, the district court (1) granted Jamar temporary legal and physical custody of the child, (2) issued another warrant for Jamar to take physical custody of the child, and (3) ordered Erika to return the child to Nebraska.

Another hearing took place in Nebraska on March 22, 2023. At the conclusion of the hearing, the district court ordered the child to remain in Nebraska during the pendency of the proceedings. The court further ordered that the parties share legal and physical custody of the child,

and it provided a parenting time schedule for them to follow until the next scheduled hearing. Erika filed an answer to Jamar's complaint on April 11, denying all allegations. The court issued a second temporary order on June 27, which preserved the prior temporary order and awarded Erika additional parenting time. The court also ordered the parties to adhere to specific travel arrangements and to utilize a parenting communication application called "AppClose."

On September 29, 2023, Erika filed a counterclaim in response to Jamar's complaint. Her counterclaim included an admission that there had been a material and substantial change in circumstances but alleged that it was in the child's best interests for her to have sole physical custody. She also requested that the court deny Jamar's request for attorney fees and to award her attorney fees instead. Jamar filed an answer to the counterclaim, denying all of Erika's allegations.

### 5. DISTRICT COURT'S ORDER

Trial took place on November 20 and 21, 2023. Both parties testified, and numerous exhibits were received into evidence. In addition, the father of Erika's other son testified on behalf of Jamar, and Erika's boyfriend testified on her behalf. As indicated previously, the background set forth above is derived from that evidence, along with the pleadings contained in our record.

The district court entered a modification order on January 2, 2024. In its findings, the court found Erika's "credibility to be suspect on several occasions." It initially noted that the February 2021 stipulated order was obtained by Erika "under the guise of job opportunities not available to [her] in Nebraska," yet she testified that she had "not worked for over a year and had no plans to work in the immediate future even though she is capable of working." The court further observed that Erika had "moved 4 times within an 18-month period," and at different times had lived with her father "free of charge," had her own residence, and intended to relocate to live with a boyfriend "an hour away." The court was troubled by Erika's "numerous filings" in California "attempting to get jurisdiction not just transferred to California but she sought orders which if granted would have eliminated [Jamar's] ability to exercise any parenting time with the minor child or would have severely limited his ability to exercise parenting time or would have required that parenting time to be supervised." It noted that "[m]any of these filings in California" were filed after Jamar filed his contempt action and complaint to modify. The court found that "[t]hese filings, based on the timing and the testimony of [Erika] were done deliberately to attempt to prevent [Jamar] from exercising his parenting time and to prevent the minor child from being returned" to Nebraska. It pointed out that the allegations in Erika's November 2022 emergency filing in California were determined to be unfounded by January 2023, yet Erika filed for a protection order in March raising the same allegations. Erika "further included allegations of 'domestic violence' based on [Jamar] taking law enforcement to [Erika's] residence in California in a lawful attempt to execute a warrant/custody order issued by this Court . . . for the return of the minor child." The court found it "particularly troublesome" that Erika "specifically testified during trial that she 'has never done anything to prevent [Jamar] from seeing his child.'" The court stated, "This is directly contrary to the specific actions she took . . . asking that his parenting time be supervised and/or suspended altogether. The Court finds that not only did [Erika] purposely interfere in [Jamar's] parenting time but that she was attempting through numerous court filings . . . to put up numerous legal barriers" in California to prevent Jamar from seeing his child.

The district court further found that Erika had a "significant medical episode resulting in the loss of her driver's license, but that she nevertheless drove before her license was reinstated. It pointed out Erika's "social and historical use of marijuana," and that when the "issue of a request for hair follicle testing" was raised, Erika "testified/did admit to cutting off a large amount of hair after the request." The court was concerned that Erika failed to produce the medical record for the September 9, 2022, incident "which further affected [Erika's] overall credibility with the Court." It stated, "The only person who apparently knows what tests if any, including blood/urine results, is [Erika] and she has refused and/or failed to provide such information." "There were only references back to that date in other medical records but no medical records produced which clearly and succinctly outline the real events of that day." It also noted that as a result of the medical event, Erika allowed Jamar to travel to California and take the child back to Nebraska for approximately the next month.

The district court also found, "Of more concern is [Erika's] admission she has apparently been cured of Major Depressive Disorder and Post Traumatic Stress Disorder and is no longer seeking treatment." The court observed that PTSD was the "very thing" for which Erika was "medically discharged from the military and has received a 100% disability status." Erika "abruptly stopped the numerous psychotropic medications and counseling she had been involved in for several years the moment she returned to California," and she "admitted" that she failed to seek medical advice prior to making that decision. The court found that Erika "arbitrarily decided she no longer needed professional assistance without care or concern how it would affect the minor child or her ability to care for the minor child or with the minor's ability to have a good healthy relationship with either parent." It noted that Erika admitted that she was struggling with her mental health, saying "'everything for me sucks right now'" and she was "'struggling emotionally, mentally, financially,'" and had not "'been able to shake this funk.'" The court pointed out that Erika admitted to locking the parties' child and her other son in the house with her, "providing no social contact, for over a month," and that she described herself as "'emotionally drained and physically hurting' with her body 'breaking the fuck down.'"

In summary, the district court found

there is sufficient evidence of [Erika's] forum shopping, evidence of parental alienation committed by [Erika], evidence of [Erika's] interference with orders of this Court, evidence of [Erika] inducing [Jamar] into accepting a consent Decree under misrepresentation or fraud, evidence of [Erika] failing to adhere to custody provisions of the Consent Decree, evidence of [Erika] failing to foster a relationship between [Jamar] and minor child, evidence [Erika's] mental and physical health may put the minor child at risk, and evidence [Erika] has a pattern of abusing the justice system to gain strategic judicial advantage to the detriment of the minor child and his relationship with [Jamar]. The repeated filings of [Erika] in California, making repetitive false allegations of safety concerns, and repeatedly including the criminal history of [Jamar] from decades earlier, are clear evidence of [Erika's] use of the child to establish control over [Jamar] in the judicial systems of California and Nebraska.

After setting forth all the above findings, the district court found that Jamar had "established multiple material changes in circumstances [that] when looked at separately rise to

the level of justifying a change in circumstances and when taken in totality clearly justify a change in custody." It found that "ordering physical custody to [Jamar] with placement in the State of Nebraska [was] in the best interests of the minor child."

The district court also found that Erika was in contempt of its previous order by intentionally, willfully, and maliciously interfering with Jamar's court-ordered parenting time. It also determined that Erika should be responsible for "some portion" of Jamar's attorney fees "as a result of the willful and contumacious acts of [Erika], including her multiple and repeated frivolous filings in California."

The district court sustained Jamar's complaint for modification, finding that Jamar had established "multiple material and substantial changes in circumstances" that occurred since the previous order and that a "change of custody and a revised parenting plan" was in the best interest of the parties' son. Erika's counterclaim was dismissed with prejudice. The court retained the parties' joint legal custody arrangement, however Jamar was awarded "final say in all medical and school decisions in the event of an impasse." The parties were also awarded joint physical custody of the child, with Erika awarded more than 109 overnights per year. However, the child's primary residence was to be with Jamar. Erika was awarded 10 consecutive days of parenting time each month until the child "reaches school age of 5 years old or [Erika] relocates and resides within 30 miles of [Jamar's] home." Erika was to be responsible for her own travel costs and for the child's travel costs at the commencement of her parenting time; Jamar was responsible for the child's travel costs at the conclusion of Erika's parenting time. In the event Erika relocated to "within 30 miles of Jamar's residence on a permanent basis," the parties would "share parenting time and custody on a joint basis of a 2/2/3 parenting schedule." Holiday and summer parenting time was also addressed. Erika was ordered to pay Jamar $504 a month in child support so long as she exercised at least 109 days of overnight parenting time per year; if not, child support "shall revert to a full custody calculation" and she would owe $763 per month "commencing January 1st of the new year." Erika was ordered to pay Jamar $10,000 in attorney fees, to be paid in increments of $500 per month until paid in full. The court found Erika in contempt but found a "purge plan unnecessary given the change in custody"; she was therefore "purged of the contempt."

Erika appeals.

## III. ASSIGNMENTS OF ERROR

Erika assigns that the district court abused its discretion (1) when it "set aside" the parties' "2021 consent decree"; (2) when it determined a material change of circumstances took place since the 2021 order and modified the order "based on findings not supported by the evidence"; (3) by failing to "apply the best interest standards or the removal standards" when it changed the former custody arrangement; and (4) by setting child support using "imputed income," by finding Erika in contempt of court, and by awarding attorney fees without sufficient evidence.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record and will be affirmed absent an abuse of discretion. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). But when evidence is in conflict, the appellate court considers and may give weight to the

fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Braun v. Braun*, 306 Neb. 890, 947 N.W.2d 694 (2020).

A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018).

## V. ANALYSIS

### 1. MODIFICATION OF 2021 ORDER

Erika's first three assignments of error all relate to the district court's decision to modify the 2021 stipulated order. She claims the court abused its discretion (1) when it "set aside" the parties' "2021 consent decree," (2) when it determined a material change of circumstances took place since the 2021 order and modified the order "based on findings not supported by the evidence," and (3) by failing to "apply the best interest standards or the removal standards" when it changed the former custody arrangement.

We first point out that the district court did not "set aside" the 2021 stipulated order. It did, however, modify that order. Therefore, we will focus our analysis on whether there was a material change in circumstances since the initial order was entered in 2021 that affected the best interests of the minor child, and whether it was in the child's best interests to change the 2021 physical custody and parenting time arrangement.

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Id*. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id*. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

### (a) Material Change in Circumstances

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the trial court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. See *id*. Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id*. The rationale for limiting modifications of custody and parenting time to only those necessitated by a material change in circumstances is to avoid extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life. *Id*. Simply put, a custody or parenting time order will not be modified absent proof of new facts and circumstances

arising since the order was entered that affect the best interests of the child. *Id*. An increase or escalation in parental instability or parental behavior that affects the best interests of the child can support a judicial finding that there has been a material change in circumstances, even if there is some evidence of similar behavior in the past. *Id*. See, for example, *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020) (increase in custodial mother's periods of unemployment and resulting housing instability since prior modification affect best interests of child by exposing child to frequent moves).

The district court found that Jamar had proven "multiple material and substantial changes in circumstances," as we previously set forth above. In its modification order, the court determined that Erika had obtained the 2021 stipulated order "under the guise of job opportunities not available to [her] in Nebraska," but that she had "not worked for over a year and had no plans to work in the immediate future even though she is capable of working." It pointed out that she had moved "4 times within an 18-month period." It was concerned that she sought orders in California attempting to eliminate or limit Jamar's parenting time with their son, and the court found it "particularly troublesome" that Erika testified that she had "never" done anything to prevent Jamar from seeing their son, yet that was "directly contrary to the specific actions she took." The court also raised the issue of Erika's September 2022 medical episode, for which she failed to produce any medical records from that day, and "[o]f more concern," was Erika's admission that she "abruptly stopped the numerous psychotropic medications and counseling" for her PTSD and depression without seeking medical advice. The court pointed out that Erika admitted to locking the parties' child and her other son in the house with her for over a month without any social contact and described herself as being "'emotionally drained and physically hurting' with her body 'breaking the fuck down.'"

The record supports the district court's conclusion that a material change in circumstances has occurred since the February 2021 order. The above evidence, all having occurred or having been discovered since the February 2021 order, demonstrates a material change in circumstances affecting the best interests of the parties' child. Even Erika's "Counter-Claim" filed in September 2023, in which she was seeking sole custody of the parties' child, alleged there had been a material change in circumstances warranting modification of the prior order. Therefore, we next consider whether Jamar proved that changing the child's physical custody, primary residence, and parenting time was in the child's best interests.

(b) Best Interests of Child

When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Jones v. Jones, supra*. Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. *Id.* No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending

on the evidence presented in each case. *Id.* The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id.*

In the present case, the district court concluded that modification of the parties' February 2021 order was in the child's best interests. In reaching this conclusion, it relied on the same evidence set forth in its findings for a material change in circumstances. In summary, the court was concerned about Erika's "forum shopping"; her "parental alienation"; her interference with Nebraska court orders; her prior misrepresentation about employment to facilitate the entry of the stipulated February 2021 order allowing her to move to California; her failure to comply with the custody provisions of that order; her failure to foster a relationship between the child and Jamar; the evidence of her mental and physical health; her "pattern of abusing the justice system to gain strategic judicial advantage to the detriment of the minor child and his relationship with [Jamar]"; her repeated filings in California; her "repetitive false allegations of safety concerns, and repeatedly including the criminal history of [Jamar] from decades earlier." The court found that many of these actions showed Erika's "use of the child to establish control over [Jamar] in the judicial systems of California and Nebraska." The court therefore determined that "ordering physical custody to [Jamar] with placement in the State of Nebraska [was] in the best interests of the minor child."

The fact that one parent might interfere with the other's relationship with the child is a factor the trial court may consider in granting custody, but it is not a determinative factor. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). In the present case, in addition to the district court's concern with Erika's various attempts to interfere with the child's relationship with his father, the court also made findings indicative of Erika's poor judgment (driving on a suspended driver's license); mental and physical health problems (Erika describing herself as "'emotionally drained and physically hurting'" and with her body "'breaking the fuck down'"); instability (moving "4 times within an 18-month period"); lacking credibility (Erika's credibility was "suspect on several occasions," she obtained the 2021 stipulated order "under the guise of job opportunities not available to [her] in Nebraska," she denied ever preventing Jamar from seeing their son despite actions she took to affect his parenting time, and she refused to produce the medical records for her September 9, 2022, medical incident); and despite Erika being "medically discharged from the military" and receiving a "100% disability status" for her PTSD, Erika "abruptly stopped the numerous psychotropic medications and counseling she had been involved in for several years the moment she returned to California." Erika admitted that she failed to seek medical advice prior to making that decision, and the court found that Erika "arbitrarily decided she no longer needed professional assistance without care or concern how it would affect the minor child or her ability to care for the minor child or with the minor's ability to have a good healthy relationship with either parent." The record supports the trial court's determination that it was in the child's best interests to modify physical custody and parenting time.

(c) Relocating Child From California to Nebraska

Finding no abuse of discretion in the district court's determination that there had been a material change in circumstances since the February 2021 order, and that the best interests of the child warranted a change in physical custody and parenting time, we next address Erika's argument that the district court failed to apply "Nebraska Law and criteria in determining both the best

- 12 -

interest and the removal [standards] when ordering the child returned to Nebraska after nearly two (2) years with his mother in California by virtue of the 2021 Consent Decree." Brief for appellant at 40.

In support of her argument that the district court failed to consider best interests and removal standards, Erika cites to *Taylor-Couchman v. Dewitt-Couchman*, 29 Neb. App. 950, 964 N.W.2d 320 (2021) for the list of removal factors initially identified in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999) (mother previously granted physical custody granted permission on modification to move with child from Nebraska to another state). *Farnsworth, supra*, is "sometimes referred to as a 'true removal' case." *Franklin M. v. Lauren C.*, 310 Neb. 927, 935, 969 N.W.2d 882, 888 (2022). We note that *Taylor-Couchman v. Dewitt-Couchman, supra*, also cites to *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013), which involved a noncustodial parent seeking to modify custody and permission to move the parties' child from Nebraska to another state. That case "clearly directed trial courts to conduct a *Farnsworth* analysis prior to making a decision regarding removal in a modification action, even if a material change of circumstances has been found and the trial court has concluded that a change of custody is in the children's best interests." *Taylor-Couchman v. Dewitt-Couchman*, 29 Neb. App. at 966, 964 N.W.2d at 333.

"[W]here a change in physical custody will also require relocating the child to another state, additional factors must be considered to determine whether the change in custody is still in the child's best interests." *Burton v. Schlegel*, 29 Neb. App. 393, 420, 954 N.W.2d 645, 664 (2021). "Thus, the best interests considerations for determining custody and the best interests considerations for determining removal become intertwined when a change in custody necessarily includes the relocation of the child's primary residence to another state." *Id*. See, also, *Clinton M. v. Paula M.*, 21 Neb. App. 856, 844 N.W.2d 814 (2014) (in circumstances where parents share joint legal and physical custody, parent seeking modification must first prove material change in circumstances affecting best interests of child by evidence of legitimate reason to leave state, together with expressed intention to do so; once parent seeking modification has met threshold burden, separate analyses of whether custody should be modified and removal should be permitted become intertwined); *Brown v. Brown*, 260 Neb. 964, 621 N.W.2d 70 (2000) (whether modification of custody and relocation are in children's best interests inevitably merge into single question of whether best interests of children are furthered by parent obtaining sole physical custody and relocating children).

In this case, the district court determined that it was in the child's best interests to change his physical custody from Erika having sole physical custody to both parents having joint physical custody, with the child's primary residence being in Nebraska with Jamar. This necessarily required relocating the child from California back to his original home state of Nebraska. Although the district court did not conduct a separate "removal analysis," we conclude that the court implicitly determined that relocation back to Nebraska was in the child's best interests for the same reasons stated by the court in determining there had been multiple material changes in circumstances, which also supported its conclusion that changing physical custody and parenting time was in the child's best interests. In other words, the consideration of evidence regarding the child's best interests for changing physical custody and for relocating back to Nebraska were intertwined. See *Burton v. Schlegel, supra* (best interests considerations for determining custody

and best interests considerations for determining removal become intertwined when change in custody necessarily includes relocation of child's primary residence to another state).

Erika contends there was not a lot of evidence regarding what the child's life would be like upon returning to Nebraska. She points out that Jamar offered no photos of his housing and that no family members testified at trial. While that is true, there was other favorable evidence regarding Jamar's parenting. The California Children Services Division Court and Specialized Investigations "Report of Findings" dated January 11, 2023, was received into evidence and it contains information about Jamar as a parent. One of Jamar's adult daughters, along with her mother, were interviewed as part of the investigation stemming from Erika filing allegations of child abuse and neglect against Jamar. They both "denied having any concerns" as to the parties' minor child under Jamar's care. They both had observed the child with Jamar and stated that they "appeared bonded." The adult daughter reported that Jamar was a "supportive father and they talk often"; her mother indicated that Jamar was "'there for his kids'" and she was "surprised to hear the allegations" since Jamar was not an "aggressive father." The investigation also included an interview with one of Jamar's adult sons who also denied having any concerns about the minor child being in Jamar's care. He reported that Jamar is a "good parent" and that he "gives good advice," is "present for his children," and is a "good person to talk to." Another adult daughter reported that she did not have any concerns about the minor child being in Jamar's care, and that she had seen Jamar and the child together and they "do things as a family." She shared that they had gone to a pumpkin patch together and had a "good time." She also indicated that Jamar is a "supportive parent and helps his children with their goals."

The evidence further supports that Jamar has been actively involved in his son's life since birth and exercised all his parenting time prior to Erika's September 2022 medical incident. And at that point, Jamar demonstrated his willingness to travel to California to pick up the parties' child and to keep him for almost a month to provide Erika sufficient recovery time. Further, Erika produced no evidence to indicate that the child was not well provided for while with Jamar for that month, other than the allegations of child abuse and neglect that she made, which were determined to be unfounded. While the district court did not separately discuss the *Farnsworth* removal factors, the court's findings implicitly intertwined the best interests considerations for determining physical custody with the best interests considerations for determining removal, given that its order changing physical custody necessarily required the relocation of the child's primary residence back to Nebraska. We cannot say that the district court abused its discretion in reaching that conclusion.

## 2. CHILD SUPPORT ORDER

We now consider Erika's claim that the district court abused its discretion by using her "imputed income" in calculating her child support payments to Jamar. She argues that the "court arbitrarily assigned and imputed an additional $1,950 in income to her that was not supported by any actual evidence present[ed] by either side." Brief for appellant at 42. In determining a party's total monthly income, the Nebraska Child Support Guidelines provides that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities." Neb. Ct. R. § 4-204 (rev. 2020). The use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Hotz v. Hotz*, 301

Neb. 102, 917 N.W.2d 467 (2018). However, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Id.*

In this case, Erika had not worked for approximately a year leading up to trial. She attributed her unemployment to her medical incident and the ongoing court proceedings regarding the child. However, she provided no evidence indicating that her medical incident impacted her ability to work for an entire year, and an occasional court proceeding does not generally justify unemployment. Erika's prior completion of a massage therapy externship and her experience at a chiropractor's office provide evidence that she can secure employment again through reasonable efforts and earn more than what her disability pay provides. Erika testified that she moved to California to pursue a career in massage therapy. Her response to an interrogatory indicated that she had been earning $18 per hour working part time at a chiropractor's office from May to September 2023. She testified that she intends to work in the future. She stated, "I am fully capable of making money. That's never been an issue." She also acknowledged that she had a website where people could book massages for $85 per 60-minute session, and $125 per 90-minute session, plus traveling fees.

Imputing income is appropriate when it appears that a parent is capable of earning more income than is presently being earned and can do so through reasonable efforts. See *Hotz v. Hotz, supra.* The record supports that Erika is reasonably capable of earning more than her disability income. As such, we conclude that the district court did not abuse its discretion in calculating her child support payments.

### 3. FINDING OF CONTEMPT

Erika claims the district court abused its discretion by finding her in contempt of court for failing to comply with the February 2021 order. Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. *Becher v. Becher*, 311 Neb. 1, 970 N.W.2d 472 (2022). Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016). Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. *Id.* Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

Pursuant to the February 2021 order, Jamar was entitled to regular parenting time from the last Sunday in November beginning at 9 a.m. until the following Wednesday at 5 p.m. He was also entitled to 21 days of vacation time, provided he gave Erika 14 days' notice, as well as telephone contact "each day" with the child "at reasonable times of the day and evening." There is conflicting evidence regarding whether the parties explicitly followed the terms of the order prior to November 2022; Erika said they did, while Jamar said they did not. According to Jamar, they would schedule parenting time when he could get to California, and they would talk about it "like a week at a time" and were "on the same page when [they] first separated." When it became difficult to get his time

- 15 -

in November 2022 scheduled, Jamar informed Erika that if she did not provide him with dates for November, he would exercise his rights under the order that month and "every month until . . . summer vacation starts."

Jamar testified that he made attempts to schedule parenting time in November 2022. This is evidenced by the numerous text messages he sent to Erika in October and November, contained in exhibit 31. Initially, Jamar asked if his friend could pick the child up and bring him back to Las Vegas since his friend was making a trip to California. When that did not occur, he told Erika that he would "exercise [his] right at bare minimum for November to take [their son] the last Wednesday of the month for a week . . . according to [their] order." Erika pointed out that the February 2021 order only awarded him 3 days a month, with June being an exception. In response, Jamar stated that he would instead use vacation time. In subsequent texts, Jamar told Erika that he would adjust the days to fit her schedule and that his schedule was open. Despite these efforts, Jamar testified that he did not receive any parenting time in November 2022. Further, Erika admitted that there was a period in November when she ignored Jamar's messages and would not allow him to communicate with their son.

The evidence established that Erika willfully withheld Jamar's regular parenting time and his right to have telephone contact with the child in November 2022. Further, she also obtained a California order restricting Jamar's parenting time with his son based on allegations that were determined to be unfounded. We cannot say that the district court abused its discretion in finding Erika in contempt of court.

### 4. ATTORNEY FEES

In its order, the district court found that Erika should be responsible to pay for some of Jamar's attorney fees "as a result of the willful and contumacious acts of [Erika], including her multiple and repeated frivolous filings in California." It ordered her to pay $10,000 in increments of $500 per month commencing January 1, 2024. Erika contends this decision was an abuse of discretion.

Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). A trial court has the ability to award fees in modification proceedings. See *id.* Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id.* Jamar was the prevailing party in his complaint to modify. Jamar also prevailed in his contempt action filed against Erika, for which attorney fees can be awarded. See *Vyhlidal v. Vyhlidal*, 311 Neb. 495, 973 N.W.2d 171 (2022) (costs, including reasonable attorney fees, can be awarded in contempt proceeding when there has been finding of contempt). A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *Becher v. Becher, supra*.

Erika initiated several legal actions in California despite being informed that Jamar's "main home" was in Nebraska and that Nebraska had proper jurisdiction. On October 31, 2022, Jamar explicitly stated, "I just want to be clear [t]hat Nebraska is my home as well and my main home." Nevertheless, Erika filed to register the February 2021 order in California on November 7, 2022. Additionally, at a hearing on February 10, 2023, Erika was informed that the judges in California and Nebraska had conferred and unanimously decided that Nebraska had jurisdiction and that

California would dismiss its cases. Despite this, she proceeded to file additional actions in California on March 7, including a request for a domestic abuse protection order against Jamar. Also noteworthy, at trial Erika testified, "I fully understand Nebraska has jurisdiction and I'm not looking, seeking, nor wanting to change jurisdictions."

As a result of Erika's actions, Jamar incurred legal fees in both Nebraska and California. His attorney's affidavit offered and received at trial reflected more than $30,000 in fees incurred leading up to trial, with another $11,000 anticipated for trial. Erika's refusal to schedule parenting time in November 2022 and her persistent filings in California, despite clear jurisdictional determinations, created unnecessary complications and expenses for Jamar. We find no abuse of discretion by the district court's award of attorney fees.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's January 2, 2024, order.

AFFIRMED.